**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| HUMANA INC. *and* AMERICANS FOR BENEFICIARY CHOICE,<br><br>　　　　　　　　*Plaintiffs,*<br><br>*v.*<br><br>U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; CENTERS FOR MEDICARE & MEDICAID SERVICES; ROBERT F. KENNEDY JR., *in his official capacity as Secretary of Health and Human Services; and* MEHMET CENGIZ OZ, *in his official capacity as Administrator of the Centers for Medicare and Medicaid Services,*<br><br>　　　　　　　　*Defendants.* | Case No. 4:25-cv-779 |

**COMPLAINT**

Plaintiffs Humana Inc. and Americans for Beneficiary Choice, for their complaint under the Medicare statute and the Administrative Procedure Act (5 U.S.C. §§ 702, 704) against defendants U.S. Department of Health and Human Services; Centers for Medicare & Medicaid Services; Robert F. Kennedy Jr., in his official capacity; and Mehmet Cengiz Oz, in his official capacity, allege as follows.

**TABLE OF CONTENTS**

Introduction .................................................................................................. 1

Jurisdiction and Venue ................................................................................ 4

Parties ......................................................................................................... 4

Statutory and Regulatory Background ........................................................ 5

    A.   The Medicare Advantage and Medicare Part D programs ................. 5

    B.   The Star Ratings system and score calculations .............................. 8

    C.   The purpose and effect of the Star Ratings system .......................... 10

    D.   The Foreign Language Interpreter and TTY Availability measure .... 12

    E.   Plan preview periods and QBP appeals............................................ 15

Factual Allegations ..................................................................................... 16

    A.   Disconnected calls under the Accuracy & Accessibility Study .......... 16

    B.   Call in which no introductory question was posed............................ 20

    C.   Final agency action, exhaustion, and harm to plaintiffs .................... 21

Claims for Relief ........................................................................................ 22

    Count I  –  No-Callbacks Policy ......................................................... 22

    Count II  –  Call Where No Introductory Question Was Posed .................. 25

Prayer for Relief......................................................................................... 27

**INTRODUCTION**

1.     This case is a challenge to the federal government's arbitrary and capricious actions in administering the Medicare Advantage (MA) and Part D Star Ratings program. The data and calculations underlying the annual Star Ratings are dizzyingly complex, and at a first glance, this suit may appear to be a dry disagreement over technical details. It is anything but. In fact, it is about enforcing the settled ground rules for agency decision-making under the Administrative Procedure Act (APA)—in particular, the Center for Medicare and Medicaid Services' (CMS) duties to follow its own regulations and to put those regulations into practice using reason and logic.

2.     Medicare is a federal health insurance program for seniors and people with disabilities. Enrollees in the program can choose coverage under either "traditional" Medicare or the semi-privatized Medicare Advantage (MA) program. CMS is the federal agency responsible for administering the Medicare program. In that capacity, CMS publishes a Star Rating (on a scale of one to five stars) for each plan offered under Medicare Advantage and its companion drug benefit program, Medicare Part D. The Ratings are intended to reflect plan quality and performance based on a range of underlying quality measures.

3.     Star Ratings are tremendously important to the operation of the MA and Part D programs. They provide agents and brokers, and the Medicare beneficiaries they serve, with information about a plan's quality, enabling them to compare plans when shopping during the annual enrollment period. In addition, CMS must provide quality bonus payments—in amounts that can reach hundreds of millions or even billions of dollars annually—to plans with better Star Ratings. Plans must then use those payments either to lower costs for their enrollees or to provide them with additional benefits.

4.     The stakes hardly could be higher. Last year and for the first time, MA surpassed traditional Medicare measured by its share of the 60+ million Americans who

1

depend on Medicare. It is now a *half-trillion-dollar* public benefit program.

5.    Plaintiff Humana Inc. is one of the nation's largest MA organizations (MAOs), or sponsors of health insurance plans under MA and Part D. It is committed to putting health first by designing and administering MA plans of the highest quality. Indeed, high-quality healthcare and high-quality service have been the primary drivers of Humana's success over its three decades participating in the Medicare programs for private health plans, leading to a better quality of life for the enrollees it serves. The high quality of the plans sponsored by Humana is reflected in the industry-leading Star Ratings they have been assigned over the past six years. And precisely because Humana is committed to quality, it also is committed to the integrity of the Star Ratings system.

6.    Plaintiff Americans for Beneficiary Choice (ABC) is a non-profit trade association whose members include the agents and brokers who use the Star Ratings system to make informed recommendations, as well as the beneficiaries to whom they sell MA and Part D plans. All participants in the Medicare Advantage industry, including ABC's members, are guided by Star Ratings and depend on them to be reliable and accurate.

7.    On October 10, 2024, CMS finalized and released the 2025 Star Ratings. Across the board, the number of MA plans with high Star Ratings decreased significantly year-over-year. Under the 2023 Star Ratings, 21.87% of MA participants had been enrolled in 5.0 Star plans. In the 2024 Ratings, that number decreased markedly, to 7.64%. And this year, for the 2025 Star Ratings, the number plummeted yet further, to a vanishingly small 1.79%. Meanwhile, the number of enrollees in 3.5 Star plans ballooned from 18.71% in 2023 and 15.89% in 2024, to 27.71% in 2025. There are no broader, objective indications that MA plan quality has diminished over that time period.

8.    The Star Ratings calculations include measures to evaluate the performance of plans' customer-service call centers in providing foreign-language interpreters to assist

would-be enrollees calling to seek information about plan benefits. To assess these measures, CMS conducts the Accuracy & Accessibility Study, where call "surveyors" (sometimes call secret shoppers) place test calls to evaluate centers' compliance with regulatory requirements. Here, CMS lowered the Star Ratings for at least a dozen of Humana's largest plans on the basis of just three phone calls that were handled by CMS in a manner inconsistent with the agency's own regulations.

9.    Humana, ABC, and ABC's members all count on CMS to administer the Star Ratings system in a consistent, transparent, and rational manner that accords with its own regulations. If the agency develops its methodologies and undertakes its calculations in a black box while refusing to follow its own guidlines, neither regulated plans nor Medicare beneficiaries and their third-party agents and brokers will be able to rely with any confidence on the agency's reported results.

10.    Basic principles of administrative law require federal agencies follow their own rules, be open with their data and reasoning, and provide logical explanations for their decisions. CMS did little of that with respect to the 2025 Star Ratings. Plaintiffs thus bring this action seeking an order vacating Humana's 2025 Star Ratings and remanding the matter to the agency to recalculate the Ratings in accordance with its own regulations.

11.    In light of the typical schedule for reviewing and finalizing annual bids, the claims presented here are matters of pressing concern, warranting expedited resolution by the Court. Plaintiff Humana is already suffering reputational harms from the inaccurate 2025 Star Ratings, harms that will grow substantially once the Annual Enrollment Period begins on October 15. It is possible to retract and recalculate unlawful Star Ratings mid-contract-year, as CMS did after another court held in expedited proceedings that the agency committed a legal error in the 2024 Star Ratings. *See SCAN Health Plan v. HHS*, 2024 WL 2815789 (D.D.C. June 3, 2024). The same expedited relief is warranted here.

3

## JURISDICTION AND VENUE

12.     This action arises under the APA, 5 U.S.C. §§ 702, 704; and the Declaratory Judgment Act, 28 U.S.C. § 2201. The Court's subject-matter jurisdiction is invoked under 28 U.S.C. § 1331. Alternatively, this action arises under the Medicare statute, and the Court has jurisdiction under 42 U.S.C. § 405(g).

13.     Venue is proper in this District under 28 U.S.C. § 1391(e) because this is an action against officers and agencies of the United States not involving real property, and one of the plaintiffs resides in this District.

## PARTIES

14.     Plaintiff Humana Inc. is a Delaware corporation with its principal place of business at 500 West Main Street, Louisville, Kentucky 40202. Humana and its subsidiaries are providers of healthcare services, with approximately 17 million health-plan participants across the United States.

15.     Plaintiff ABC is a trade association based in Dallas, Texas. ABC's members include health insurance industry leaders and workers, consumer advocates, and concerned citizens. ABC's mission is to protect the best interests of Medicare and other health insurance beneficiaries through legislative and regulatory advocacy and participation in litigation. Through these efforts, it aims to improve the American healthcare system with sensible, forward-thinking policies that improve health insurance knowledge and education, lower healthcare costs, and maximize coverage choice for consumers. The interests and objectives that ABC seeks to advance in this litigation are thus directly relevant to its institutional mission. Many of ABC's agent-and-broker members sell Humana policies, and many of ABC's individual enrollee members have Humana coverage.

16.     The U.S. Department of Health and Human Services (HHS) is a cabinet-level agency within the United States government. Robert F. Kennedy Jr., sued in his official

4

capacity, is the Secretary of HHS. Congress has assigned HHS ultimate responsibility for administering the Medicare Advantage and Medicare Part D programs.

17.     HHS has delegated authority to administer the Medicare Advantage and Medicare Part D programs to the Centers for Medicare & Medicaid Services (CMS), an agency within HHS. *See* 66 Fed. Reg. 35437. Mehmet Cengiz Oz, sued in his official capacity, is Administrator of CMS. CMS manages the Star Ratings system and issued the Star Ratings decision that is the final agency action challenged in this case.

## STATUTORY AND REGULATORY BACKGROUND

### A.     The Medicare Advantage and Medicare Part D programs

18.     The federal Medicare program is the federal health insurance program for people aged 65 or older or with certain disabilities or end-stage renal disease. *See Medicare Program; Establishment of the Medicare Advantage Program*, 70 Fed. Reg. 4588 (Jan. 28, 2005); 42 U.S.C. § 1395kk(a).

19.     Medicare comprises four parts: Parts A, B, C, and D. *See* 70 Fed. Reg. at 4589. Medicare Part A (which covers inpatient hospital treatment) and Part B (which covers outpatient services) are together known as "traditional" or "original" Medicare. Traditional Medicare use a fee-for-service payment model. *See* 42 U.S.C. § 1395w-22(a)(1). CMS thus reimburses providers directly for the services they provide to traditional Medicare beneficiaries. *MaxMed Healthcare, Inc. v. Price*, 860 F.3d 335, 337 (5th Cir. 2017); *UnitedHealthcare Insurance v. Becerra*, 16 F.4th 867, 872 (D.C. Cir. 2021).

20.     Medicare Part C, also known as Medicare Advantage, uses a different model. *See* Medicare Prescription Drug, Improvement, and Modernization Act, Pub. L. No. 108-173, 117 Stat. 2066 (2003) (codified at 42 U.S.C. §§ 1395w-21 to 1395w-28). The program avoids the pitfalls of traditional Medicare and its single-payer, one-size-fits-all approach by offering plans sponsored by private companies called Medicare Advantage organizations,

or MAOs. These companies must cover at least the same services that Medicare beneficiaries would receive through traditional Medicare. 42 U.S.C. § 1395w-22(a). But to attract enrollees, MA plans typically offer additional benefits not covered by traditional Medicare, such as dental and vision insurance. *UnitedHealthcare*, 16 F.4th at 872.

21.    Under this public-private partnership model, MAOs do not receive fee-for-service reimbursements from CMS for the healthcare services their enrollees receive. *See generally* 42 U.S.C. § 1395w-23(a). Instead, they receive a per-enrollee monthly payment to provide coverage for all Medicare-covered benefits to the beneficiaries enrolled in their plan. *Id.* In turn, MAOs pay healthcare providers for the services they provide to MA enrollees. *Id.* § 1395w-23(a)(1); *see Caris MPI v. UnitedHealthcare, Inc.*, 108 F.4th 340, 344 (5th Cir. 2024).

22.    CMS determines a plan's monthly payment by comparing the plan's "bid" (its estimated cost of providing Medicare-covered services to a particular patient population) to a "benchmark" (the maximum amount the federal government will pay to provide coverage in the plan's service area). *Id.* § 1395w-23(b)(1)(B), (n).

23.    If the MAO's bid is below the benchmark, CMS pays the MAO its bid rate, while also returning a specified percentage of the difference between the benchmark and the bid as a "rebate," which must be used to provide additional benefits or otherwise returned to plan participants through lower premiums or cost sharing. 42 U.S.C. §§ 1395w-23(a)(1)(B)(i), (E); 1395w-24(b)(1)(C).

24.    If, in contrast, an MAO's plan bid is at or above the benchmark, the MAO receives monthly payments at the benchmark rate, and the MAO must charge enrollees an additional premium to cover the amount by which the bid exceeds the benchmark. *Id.* §§ 1395w-23(a)(1)(B)(ii), 1395w-24(b)(2)(A). *See also Medicaid & Medicare Advantage*

*Products Association of Puerto Rico v. Emanuelli Hernández*, 58 F.4th 5, 8 n.1 (1st Cir. 2023); *Elevance Health inc. v. Becerra*, 2024 WL 2880415, at *2 (D.D.C. June 7, 2024).

25.    In addition to inpatient treatment and outpatient services, Medicare beneficiaries may also obtain prescription drug coverage through Medicare Part D. Like Medicare Advantage, the Part D prescription drug benefit provides coverage through a public-private partnership with plan sponsors. These plan sponsors offer both standalone prescription drug plans (PDPs) for individuals enrolled in traditional Medicare and drug coverage bundled with an MA plan, known as an MA-PD plan. 42 U.S.C. § 1395w–101(a)(1), (3)(C).

26.    The enriched range of consumer options introduced by the MA program has produced commensurate decision-making complexity for Medicare beneficiaries who are considering enrolling in an MA plan. Congress intended for insurance brokers and agents to assist Medicare beneficiaries with their decisionmaking in this space. *See* 42 U.S.C. § 1395w-21(j)(2)(D). Indeed, agents and brokers help "millions of Medicare beneficiaries to learn about and enroll in" MA plans "by providing expert guidance on plan options in their local area, while assisting with everything from comparing costs and coverage to applying for financial assistance." 89 Fed. Reg. at 30617.

27.    Under the model that is prevalent across the MA program, agents and brokers are unaffiliated with, and not beholden to, MAOs. As independent agents, they can offer beneficiaries a diverse array of MA plans to best meet beneficiaries' needs.

28.    Since its adoption by the Bush administration in 2003, the MA and Part D programs have grown steadily. Americans prefer the choices that MA plans provide compared with traditional Medicare. The immediate predecessor to MA, called Medicare +Choice, had approximately 1.56 million enrollees in 1992. *See* CMS, *Medicare Managed Care Contract (MMCC) Plans Monthly Report*, https://perma.cc/YPK6-DDEW (click Live View). By 2023, that figure had increased to more than 30 million enrollees, surpassing for

7

the first time the number of beneficiaries opting for traditional Medicare. Nancy Ochieng, et al., *Medicare Advantage in 2023: Enrollment Update and Key Trends* (Aug. 9, 2023), https://perma.cc/EYE2-4UHR. And the Congressional Budget Office recently projected that 62% of Medicare beneficiaries would be enrolled in Medicare Advantage by 2033. Ochieng N. et al., *Medicare Advantage in 2023: Enrollment Update and Key Trends*, Kaiser Family Foundation (Aug. 9, 2023), https://perma.cc/FDQ5-8C36.

29.    Recognizing the importance of public participation in the rules and policies governing the MA and Part D programs, Congress specified by statute that "[n]o rule, requirement, or other statement of policy (other than a national coverage determination) that establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits under this subchapter shall take effect unless it is promulgated by the Secretary by regulation" using notice and comment. 42 U.S.C. § 1395hh(a). This includes rules governing the Star Ratings methodologies.

**B.    The Star Ratings system and score calculations**

30.    To assist both agents and brokers and inform would-be enrollees, CMS established the Quality Star Ratings system early in the program's existence. Star Ratings measure the quality of health and drug services received by plan participants enrolled in MA and Part D. *See* 42 C.F.R. §§ 422.162(b)(1), 423.182(b)(1).

31.    CMS evaluates MA and Part D plans along a range of quality, compliance, and other measures, and develops ratings on a five-star scale based on these measures. *See id.* §§ 422.166(a)(4), 423.186(a)(4). A 1.0 Star Rating is the worst rating, and 5.0 Star Rating is the best. *Id.* §§ 422.166(a)(4), (c)(3), (d)(2)(iv), 423.186(a)(4), (c)(3),(d)(2)(iv). The system is intended to reflect the quality and performance of each plan. 42 C.F.R. §§ 422.162(b)(1), 423.182(b)(1); *see also Elevance*, 2024 WL 2880415, at *2.

32.     The Star Ratings are based on the scores that these plans earn on various quality and performance "measure[s]." *See* 42 C.F.R. §§ 422.162(a), 423.182(a). CMS looks at measures within five broad categories: (1) outcome measures, which reflect improvements in a beneficiary's health; (2) intermediate outcome measures, which reflect actions taken which can assist in improving a beneficiary's health status; (3) patient experience measures, which reflect beneficiaries' perspectives of the care they received; (4) access measures, which reflect whether the plan creates barriers to beneficiaries receiving needed care; and (5) process measures, which capture the health care services provided to beneficiaries that can assist them in maintaining, monitoring, or improving their health status. *See* CMS, *Medicare 2024 Part C & D Star Ratings Technical Notes* 9, https://perma.cc/-Y7VK-BXN9; *Contract Year 2019 Changes to the Medicare Advantage and Medicare Prescription Drug Benefit Programs*, 83 Fed. Reg. 16440, 16532 (Apr. 16, 2018).

33.     By statute, the Star Ratings that CMS assigns to an MA plan or Part D plan must be based on the data collected in connection to the "ongoing quality improvement program[s]" that each MAO is required to establish. 42 U.S.C. §§ 1395w-22(e)(1), (3); 1395w-23(o)(4)(A); 1395w-151(b). These data sources include quality-of-care performance measures, which Medicare managed care organizations are required to report annually through the Healthcare Effectiveness Data and Information Set scheme; measures of beneficiaries' experiences with their health plans drawn from the Consumer Assessment of Healthcare Providers & Systems survey; and measures of changes in the physical and mental health of MA enrollees captured through the Health Outcomes Survey. *See* 83 Fed. Reg. at 16531. In addition to measures from these data sources, MA plan Star Ratings are also based on performance measures that "address telephone customer service, members' complaints, disenrollment rates, and appeals." *Id.*

9

### C.     The purpose and effect of the Star Ratings system

34.     The Star Ratings system serves three purposes, each of which requires the ratings to "accurately . . . reflect true performance." 83 Fed. Reg. at 16519.

35.     First, the system is designed to provide Medicare beneficiaries with "comparative information on plan quality and performance," allowing them to make "knowledgeable enrollment and coverage decisions in the Medicare program." 42 C.F.R. §§ 422.160-(b)(1), 423.180(b)(1). As CMS has explained, the "MA and Part D Star Ratings system is designed to provide information to the beneficiary that is a true reflection of the plan's quality and encompasses multiple dimensions of high-quality care," with the goal of "inform[ing] plan choice" by beneficiaries. 83 Fed. Reg. at 16520. To this end, CMS maintains the Medicare Plan Finder website, which displays information about available plans, including each plan's Star Rating. *Elevance*, 2024 WL 2880415, at *2.

36.     Second, the system is designed to help CMS perform "oversight, evaluation, and monitoring of MA and Part D plans" (83 Fed. Reg. at 16520-16521) and compliance with regulatory and contract requirements. 42 C.F.R. §§ 422.160(b)(3), 423.180(b)(3).

37.     These two goals were the initial impetus for the Star Ratings system. *See Proposed Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs for Contract Year 2012*, 75 Fed. Reg. 71190, 71219 (Nov. 2, 2010) (specifying the purposes "historically" served by the Star Ratings program as helping beneficiaries make an informed choice when selecting a plan and assisting the agency in identifying poor performance to target for compliance actions).

38.     The Star Ratings program's third, more recent, purpose is to provide "quality ratings on a 5-star rating system" to be used in administering the scheme of additional payments for high quality MA plans, known as quality bonus payments (QBPs). The QBP

system was established in 2010 by the Patient Protection and Affordable Care Act (ACA). *See* 42 C.F.R. § 422.160(b)(2); 75 Fed. Reg. at 71218.

39.    The ACA provides that an MA plan is entitled to QBPs from CMS depending on the "quality rating" of the plan, which "shall be determined according to a 5-star rating system." 42 U.S.C. § 1395w-23(e)(4)(A). Thus, if an MA plan receives a Star Rating of 4 stars or higher, its benchmark amount is increased, in turn increasing the rebates that CMS will pay by increasing the difference between the plan sponsor's benchmark and its bid. *Id.* § 1395w-23(o)(1), (3)(A).

40.    Star Ratings also determine the portion of the difference that is returned as a rebate. 42 C.F.R. §§ 422.162(b)(2), 423.182(b)(2). Plans with a 4.5 Star Rating or higher receive 70% of the difference between the benchmark and the bid; plans with a Rating between 3.5 and 4.5 Stars receive a 65% rebate, and plans with a rating under 3.5 stars receive a 50% rebate. 42 U.S.C. § 1395w-24(b)(1)(C)(v); 42 C.F.R. § 422.266(a)(2)(ii).

41.    CMS prominently displays Star Ratings in its online and print resources concerning available MA plans. *See* 42 U.S.C. § 1395w-21. Through the online Medicare Plan Finder tool, CMS displays MA plans to prospective enrollees in order of highest to lowest Star Ratings to guide beneficiaries to higher-rated plans first. Medicare beneficiaries use the Star Ratings to assess the quality of the MA plans; and agents and brokers use the Star Ratings in assisting beneficiaries in selecting a plan that fits their health care needs.

42.    Star Ratings thus influence each plan's position in the marketplace, by affecting how prospective enrollees, and the agents and brokers who advise them, perceive the comparative quality of various plans. For instance, MA-only plans with a 5.0 Star Part C summary rating and Part D plans with a 5.0 Star overall rating are displayed with a high-performing icon, while a plan that had any combination of Part C or Part D summary ratings

of 2.5 Stars or lower in the most recent three consecutive years is marked with a "low performance" icon. *See* 42 C.F.R. §§ 422.166(h), 423.186(h).

43.    The Star Ratings system is intended to reflect each plan's ability to provide quality care and benefits to its enrollees. It also affects the compensation that MAOs receive for the plans they sponsor. Moreover, regulations permit beneficiaries to change plans any time during the year, but only if the plan into which they move is a 5.0 Star plan. *Id.* § 422.62(b)(15). Star Ratings also drive whether a low-performing MA plan remains eligible to continue to participate in the program. *See Id.* §§ 422.502(b), 423.503(b).

**D.    The Foreign Language Interpreter and TTY Availability measure**

44.    At issue here is the Foreign Language Interpreter and TTY Availability measure, which is derived in relevant part from the Accuracy & Accessibility Study.

45.    Each MAO must be able to provide specific information on a timely basis to current and prospective enrollees upon request, including with a toll-free customer service call center. 42 C.F.R.§ 422.111(h). By regulation, call centers must limit average hold times to no more than two minutes, answer 80 percent of incoming calls within 30 seconds, and limit the disconnect rate of all incoming calls to no more than five percent, among other requirements. *Id.*

46.    Among the measures underlying both Part C and Part D Star Ratings are the Foreign Language Interpreter and TTY Availability measures, which gauge the availability of teletypewriter (TTY) services and foreign-language interpretation to prospective enrollees who call a plan's customer service phone line speaking a language other than English. The measures are labeled C30 (underlying Part C ratings) and D01 (underlying Part D ratings). *See 2024 Technical Notes*, at 83, 85.

47.    These measures monitor a plan's compliance with a CMS regulation that requires MAOs to maintain a customer service call center that makes foreign language

interpreters available, at no cost to the caller, for "80 percent of incoming calls requiring an interpreter within 8 minutes of reaching the customer service representative." 42 C.F.R. §§ 422.111(h)(iii), 423.128(d)(1)(iii). The regulation does not specify that the eight-minute requirement must be met in a single call and is silent on the permissibility of call backs in the event of a disconnected call.

48.    CMS conducts the "Accuracy & Accessibility Study" to evaluate plan performance on these measures. The study uses surveyors to place anonymous test calls to plans' customer-service call centers. *See* CMS, *Memo: 2024 Part C and Part D Call Center Monitoring—Timeliness and Accuracy & Accessibility Studies* 1-2 (2024).

49.    CMS retained Hendall and its subcontractor, AIR, to conduct the Accuracy & Accessibility Study and more generally "to monitor the performance of plan sponsors' call centers with respect to the standards at 42 C.F.R. § 422.111(h)(1) and 42 C.F.R. § 423.128(d)(1)."

50.    The metric used to assess foreign language interpreter availability is the number of *completed* interpreter contacts, divided by the number of attempted contacts during *connected* calls. *Id.* at 2. In line with sections 422.111(h)(1)(iii) and 423.128(d)(1)(iii), a call is considered connected when the "secret shopper" or test caller "reaches" a customer service representative (or CSR). *Id.* A contact with an interpreter is considered "completed" when the caller "establish[es] contact with an interpreter and confirm[s] that the customer service representative can answer questions" about the plan's Medicare Part C or Part D benefits "within eight minutes." *2024 Technical Notes*, at 83, 85.

51.    CMS has a practice of "invalidating" certain calls—that is, excluding them altogether from this ratio of completed to attempted contacts. CMS's practice is to invalidate calls when, among other circumstances, there is no evidence that the plan was at fault for a call that was not successfully connected or completed. CMS's study thus places a call

13

into one of three categories: (1) successfully completed; (2) not successfully completed (after having been connected); or (3) invalidated (*i.e.*, excluded from the study and not considered for purposes of Star Ratings). Invalidating calls is not unusual during the plan preview process. As a result of Humana's dialog with CMS during the latest plan preview period, for instance, CMS invalidated four calls.

52.    CMS test callers must follow predefined procedures before they may conclude that a call center has "completed" a call for assessment. *2024 Technical Notes* 5-6. First, the CMS test caller must dial the plan number. Second, the test caller must connect with the plan's customer service representative. Third, the CMS test caller must ask an introductory question, to which the customer service representative must answer affirmatively.

53.    In testing interpreter availability, the CMS test caller will place a call to the plan's customer service call center, pose a question in a foreign language, and wait for the customer service representative to bring an interpreter to the phone to assist the representative in answering the introductory question. CMS allows for an eight-minute window for the CSR to connect to an interpreter and answer the introductory question. See *Timeliness and Accuracy & Accessibility Studies*, at 2. These prerequisites ensure that the call center is evaluated according to its own actions or inactions and not assigned responsibility for problems outside its control.

54.    To receive 5.0 Stars on the call center measure in the 2025 Star Ratings, CMS required 100% of non-invalidated foreign language calls to be scored as successful. Given the demand for perfection to receive 5.0 Stars on the call center measure, CMS's decisions regarding whether and how to score just a single call included in the study can have an enormous impact on a plan's overall Star Rating, and consequently an outsized impact on a plan's ability to offer competitive benefits and premiums for enrollees.

### E.    Plan preview periods and QBP appeals

55.    Given the importance of Star Ratings to the MA program, and the sensitivity of the system to erroneous or unreliable data, CMS's regulations establish an administrative process through which MAOs and other plan sponsors can review and comment on, and challenge the adequacy of, the agency's preliminary calculations. The regulations call this administrative process the "plan preview" periods: "CMS will have plan preview periods before each Star Ratings release during which MA organizations can preview their Star Ratings data in HPMS prior to display on the Medicare Plan Finder." 42 C.F.R. § 422.166-(h)(2); *see also id.* § 423.186(h)(2). HPMS is CMS's Health Plan Management System, a website used to facilitate communications between CMS and MAOs.

56.    The plan preview process is the only administrative process available to a plan permitting it to comment on and participate in the Star Ratings process before Star Ratings are published by CMS.

57.    CMS holds two preview periods. During the first plan preview, CMS directs MAOs to "closely review the methodology and their posted numeric data for each measure." 83 Fed. Reg. at 16588. During the second plan preview, CMS will post to the System "any revisions made as a result of the first plan preview," as well as the "preliminary Star Ratings for each measure, domain, summary score, and overall score." *Id.* CMS again directs MAOs to "closely review the methodology and their posted data for each measure, as well as their preliminary Star Rating assignments." *Id.*

58.    CMS retains Hendall (and its subcontractor, AIR) not only to conduct the test calls for the Accuracy & Accessibility Study, but also to review and resolve plans' objections to the classifications of call results during the plan preview period.

59.    Following the completion of the MA bid process, CMS allocates quality bonus payments. The calculation of QBPs for each MA plan turns, in part, on each plan's

applicable Star Ratings. An MAO that believes it has not been allocated the QBPs to which it is entitled may file an optional administrative appeal before a CMS hearing officer pursuant to 42 C.F.R. § 422.260. This appeal process allows an MAO to challenge, among other things, CMS's calculation of Star Ratings.

60.     The initial decision of a hearing officer on a QBP appeal is "subject to review and modification by the CMS Administrator within 10 business days of issuance." 42 C.F.R. § 422.260(c)(2)(vii). If the Administrator does not modify the hearing officer's decision within that two-week timeframe, the hearing officer's decision becomes "final and binding." *Id*. If the Administrator does modify the decision "within 10 business days," the Administrator's decision becomes the agency's final word.

## FACTUAL ALLEGATIONS

### A.     Disconnected calls under the Accuracy & Accessibility Study

61.     During the CY 2025 Accuracy & Accessibility Study, CMS identified two relevant calls (cases D1100955 and D0900533) placed to Humana customer service representatives as "incomplete" because the calls disconnected. The two calls disconnected due to third-party internet connection interruptions while Humana's service representatives were connecting with an interpreter to join the call. Together, these calls reduced the overall Star Ratings for many of Humana's largest contracts.

62.     CMS monitors call disconnects under the separate Timeliness Study element of the Call Center Monitoring Program.

63.     In the event of a dropped call, Humana's standard protocol is for the customer services representative to call the prospective enrollee back. In response to inquiries from Humana during the second plan preview period for the 2025 Star Ratings, CMS indicated that—as a policy—it does not allow callbacks from plans in the context of the Accuracy & Accessibility Study, requiring the secret shoppers to receive responses to their questions in

the test language within a single call. When Humana explained its standard protocol in re-

sponse to dropped calls, CMS responded this way in an email sent on September 16, 2024:

> Your plan is disputing these calls as your procedure is to obtain the phone number of the prospective member and then to call them back if there is a disconnection. However, CMS does not allow callbacks from the plan as all questions should be answered in a single call. . . . [It also] will not revise results based on challenges to the methodology, which has been applied to all subjects of the study.

64.    CMS has never explained why "all questions should be answered in a single call," or why this single-call criterion should be given controlling significance. The agency's regulations require only that a plan make foreign language interpreters available to assist non-English speaking (and limited English proficient) Medicare beneficiaries within eight minutes of an initial connection. 42 C.F.R. §§ 422.111(h)(1)(iii), 423.128-(d)(1)(iii). The regulations do not specify that the foreign language interpreter must be made available in a single call requirement. CMS and its contractors nevertheless enforce a single call requirement, which was not adopted in notice-and-comment rulemaking.

65.    Humana's standard practice requires a customer service representative to at-tempt to call back a real-world caller if the call is unexpectedly disconnected. To that end, the standard sales script used by Humana's customer service representatives includes the following question: "What is your phone number so that I may call you back in the event our call gets disconnected?" If a call is unexpectedly disconnected and a callback becomes necessary, the customer service representative will dial the caller's telephone number as reported in response or otherwise as shown in the caller identification information. Such callbacks are not computer automated.

66.    For two reasons, it is almost always possible to identify CMS test calls at the outset of a customer service telephone call. First, CMS test callers follow standard scripts that are readily identified. For foreign-language interpreter test calls under the Accuracy &

Accessibility Study, the CMS test caller will ask in a foreign language "Are you the right person to answer questions about" a given topic. CMS guidance instructs plans to train customer service representatives to identify this introductory question and to take specific, non-standard steps in response. Second, CMS test callers typically place multiple test calls from the same phone number. Humana's automatic number identification system allows the company to track the numbers that CMS uses for test calls throughout the testing season. In the case of C0701002, for example, Humana's call centers had received six prior test calls from the same number in 2024.

67.    Humana's customer service representatives therefore generally know when they are speaking with a CMS test caller rather than a real-world caller. And to comply with CMS guidance for "successful" handling of such calls, a representative speaking with a CMS test caller must deviate from Humana's standard sales script and thus will refrain from requesting callback information.

68.    When calls with CMS test callers have been unexpectedly disconnected in the past, Humana's customer service representatives nonetheless have occasionally attempted callbacks to re-establish connections. But when they have done so, they have received the following automated message: "We're sorry, your call cannot be completed at this time. Please hang up and try your call again later. Thank you."

69.    The customer service representatives who handled calls D1100955 and D0900533 did not attempt callbacks after the calls were disconnected because callbacks are not permitted for CMS test calls. Any attempted callback would have been met with a "your call cannot be completed" automated response.

70.    When Humana raised these issues with CMS during the plan preview period, CMS directed Hendall to review Humana's objections to calls D1100955 and D0900533. Hendall acknowledged that Humana's "procedure is to obtain the phone number of the

18

prospective member and then to call them back if there is a disconnection." Humana, in turn, explained that it "was unable to complete these calls" with callbacks "due to technical limitations imposed by the CMS study that do not exist when Humana CSRs engage with actual Medicare beneficiaries."

71.     The no-callbacks policy was the sole and independent basis upon which CMS (really, its third-party contractor) rejected Humana's objections during the plan preview period. When Humana complained that it should have been allowed to meet the regulatory requirements for foreign-interpreter availability by placing call-backs, Hendall responded: "we do not allow callbacks from the plan as all questions should be answered in a single call." With no analysis or explanation of its own, CMS "agree[d] with keeping" the calls "as is," later stating that "CMS does not allow callbacks from the plan as all questions should be answered in a single call."

72.     If CMS or its contractors permitted callbacks rather than blocking them with automated responses, Humana would not exempt CMS test calls from its standard callback policy. In that event, the customer service representatives who handled calls D1100955 and D0900533 would have been required to attempt callbacks within the eight-minute time period established by 42 C.F.R. §§ 422.lll(h)(l)(iii), 423.128(d)(l)(iii).

73.     Thus, if CMS had not imposed additional requirements that do not appear in the Code of Federal Regulations and were not adopted in notice-and-comment rulemaking, the calls at issue would have been designated "complete" for purposes of the Accuracy & Accessibility Study.

74.     CMS's arbitrary policy of not permitting callbacks adds unlawfully to the requirements for foreign language calls appearing in sections 422.111(h)(1)(iii) and 423.128-(d)(1)(iii), which includes connection with an interpreter within eight minutes regardless of the number of calls. Moreover, the policy does not improve the "quality" of a plan or its

services, and it leads to double-counting of technical call drops in the context of foreign-language calls—such a dropped call counts against a plan sponsor in both the Timeliness Study and the Accuracy & Accessibility Study.

**B.    Call in which no introductory question was posed**

75.    CMS identified a third call (case C0701002) as "incomplete" during the CY 2025 Accuracy & Accessibility Study, which again adversely impacted the Star Ratings calculations for Humana's largest contracts. Humana's call recording software shows that the test caller in case C0701002 initiated a phone call to a Humana customer service representative and that an audio connection was established. But during this test call, the CMS secret shopper never uttered a word. The caller remained silent throughout the entire duration of the call. After an extended period of several minutes of silence with no communication, the call was disconnected.

76.    CMS requires plan sponsors to make foreign language interpreters available to would-be enrollees "within 8 minutes of *reaching* the customer service representative." 42 C.F.R. §§ 422.111(h)(iii), 423.128(d)(1)(iii) (emphasis added). In the context of a telephone call, the word "reach" means *communicate with. See New Oxford American Dictionary* 1415 (2001) (defining "reach" as to "communicate with (someone) by telephone or other means"); *Webster's Third New International Dictionary* 1888 (1986) (defining "reach" as to "communicate with . . . by phone"). When a secret shopper does not successfully communicate a single word with a customer service representative, the secret shopper has not triggered the duty to bring an interpreter on the line.

77.    Humana objected to CMS's inclusion of call C0701002 in the Accuracy & Accessibility Study. In particular, it reminded CMS that its guidance advises that "[a] call is considered connected when the caller confirms that the call connects to the CSR." It argued that "the CMS caller did not attempt any communication whatsoever, and thus never

confirmed that the call was connected to the CSR, which strongly indicates a mistake was made by the CMS caller."

78.    CMS had no substantive response, insisting only that it was not "unusual" that the caller did not speak while failing to acknowledge or reconcile its contrary guidance. The agency did not assert that an audio connection was never established, and it did not ask Humana to produce evidence showing that it had.

79.    Moreover, CMS referred Humana's challenge to Hendall, and Hendall recommended that CMS "keep the outcome as is." CMS adopted the recommendation without independent explanation or analysis.

### C.    Final agency action, exhaustion, and harm to plaintiffs

80.    CMS issued the final 2025 Star Ratings on October 10, 2024. The determination of the 2025 Star Ratings is final, not tentative. Humana sought reconsideration of its Star Ratings and quality bonus payments, which was denied. It then pursued an appeal of its QBPs pursuant to 42 C.F.R. § 422.260. A CMS hearing officer denied administrative relief on April 14, 2025, affirming the denial of Humana's request for reconsideration of its QBPs. The decision was "subject to review and modification by the CMS Administrator" (42 C.F.R. § 422.260(c)(2)(vii)), which also was denied. Humana thus exhausted all optional and discretionary avenues of administrative review.

81.    A final Star Rating determines legal rights and obligations, and legal consequences flow from them. CMS may terminate a plan's MA contract that has failed to achieve a Part C summary rating of at least three stars for three consecutive contract years. 42 C.F.R. § 422.510(a)(4)(xi). In addition, while plans are typically barred from allowing Medicare beneficiaries to switch to their plan until the annual enrollment period, regulations permit such a switch at any time during the year if the plan into which a beneficiary moves has a 5.0 Star Rating. *Id*. § 422.62(b)(15).

82.    Issuance of Star Ratings immediately injures adversely affected plan sponsors like Humana. When CMS publishes Star Ratings in the Medicare Plan Finder, the Star Ratings impact each plan's reputation. Humana has and will continue to suffer reputational injury given its previous track record of earning industry-leading Star Ratings.

83.    ABC's member agents and brokers also are injured. A key aim of the Star Ratings system is to offer Medicare beneficiaries and their agents and brokers "comparative information on plan quality and performance" to allow them to make "knowledgeable enrollment and coverage decisions." 42 C.F.R. §§ 422.160(b)(1), 423.180(b)(1). Agents, brokers, and beneficiaries' ability to use the Star Ratings system to inform their enrollment decisions depends on the ratings being a "true reflection" of plan quality. 83 Fed. Reg. at 16520. When Star Ratings are calculated without observance of the agency's own rules, they do not accurately reflect plan quality. Agents and brokers working to make the best and most accurate recommendations for their clients therefore must do additional research on the plans they recommend, to confirm whether reductions in Stars Ratings actually reflect changes to plan quality. In addition, many of ABC's beneficiary members have long been enrolled in Humana plans that, under the 2025 Star Ratings, will receive lower QBPs and thus offer less generous supplemental benefits or require higher cost-sharing.

**CLAIMS FOR RELIEF**

**Count I**
**No-Callbacks Policy**

84.    Plaintiffs reallege the allegations set forth in all prior paragraphs of this complaint as though fully set forth herein.

85.    CMS's no-callbacks policy is unlawful because it was adopted without notice and comment rulemaking. It is also arbitrary and capricious, and its application in this case was unattended by any explanation by CMS.

86.    CMS's Accuracy & Accessibility Study is conducted to monitor compliance with CMS regulations that require plan sponsors to make foreign language interpreters available to non-English speaking and limited English proficient prospective enrollees "within 8 minutes of reaching the customer service representative" by telephone. 42 C.F.R. §§ 422.111(h)(iii), 423.128(d)(1)(iii). That requirement calls for an interpreter to be made available within a period of time (within eight minutes of reaching the representative), not for one to be made available within a single call.

87.    CMS has consistently indicated in guidance that a call with an interpreter is defined as "completed" when the caller is able to receive responses to their questions about plan benefits "within eight minutes." *2024 Technical Notes*, at 83, 85; *Timeliness and Accuracy & Accessibility Studies*, at 2. The guidance is also silent on callbacks.

88.    CMS has adopted a policy without notice-and-comment rulemaking by which a call will be deemed "incomplete" if it is disconnected, even if the secret shopper receives a callback and is able to receive responses to his or her questions with the help of an interpreter less than eight minutes after initially reaching a customer service representative. CMS's policy is not to permit callbacks under any circumstance.

89.    In the disconnected calls that Humana challenges in this suit, the customer service representative was in the process of connecting the secret shopper with an interpreter when the call dropped due to technical reasons outside of Humana's control. Had the customer service representative been permitted to call back after the call was disconnected, they would have been required to do so, and the secret shoppers would have received responses to their questions within eight minutes of initial contact.

90.    CMS's no-callbacks policy violates its regulations and guidance, which allow an eight-minute timeframe from the time a caller reaches a customer service representative for the caller to receive responses to questions about plan benefits, regardless of whether

this happens within a single call. CMS's policy is thus arbitrary and capricious—as are, by extension, the CY 2025 Accuracy & Accessibility Study scores for Humana impacted by calls D0900533 or D1100955, and the ultimate 2025 Star Rating for those contracts. *See State v. EPA*, 91 F.4th at 291.

91.    CMS's no-callbacks policy further violates 42 U.S.C. § 1395hh(a), which requires every "rule, requirement, or other statement of policy" that "establishes or changes a substantive legal standard" that determines either "payment for services" or "the eligibility of individuals, entities, or organizations to furnish or receive services or benefits" to be adopted by notice-and-comment rulemaking.

92.    If Section 1395hh(a) does not apply, then the no-callbacks policy violates 5 U.S.C. § 553. By either path, the no-callbacks policy was not adopted in conformity with notice-and-comment requirements.

93.    CMS previously has explained that "[t]he Accuracy & Accessibility Study," which includes testing of foreign-language interpreter availability, "is performed to (1) ascertain the accuracy of responses to plan benefit questions provided by customer service representatives when calling the call center in addition to (2) testing the availability of interpreters for Limited English Proficient callers and (3) testing TTY [teletypewriter] functionality." 83 Fed. Reg. at 16550. "Plan sponsors are required to provide an interpreter for any caller speaking a foreign language," and through the study, "CMS seeks to ensure that more vulnerable populations have equal access to interpreters." *Id.*

94.    The no-callbacks rule does nothing to advance those objectives. Under the no-callbacks rule, a dropped call automatically results in an unsuccessful rating, even when a representative could perform a callback and connect the caller with an interpreter in under eight minutes. But a dropped call does not necessarily mean that an interpreter is unavailable in the time required—and that is all foreign-language test calls are meant to measure.

24

*See* AR38. By automatically penalizing MA plans for call disconnections in the Accuracy & Accessibility Study, the policy produces results that do not reflect the plan's performance with respect to the measure that the study is actually intended to assess.

95.    Call disconnections sometimes happen. When they do happen, the better side of customer service is for the customer service representative to attempt an immediate, personal callback, rather than to let the disconnection stand. CMS has not explained why its test policies do not permit this best practice.

96.    The no-callbacks policy also double counts disconnects. CMS already uses another measure—the Timeliness Study—to evaluate call disconnections. See 42 C.F.R. §§ 422.111(h)(1)(ii)(C), 423.128(d)(1)(ii)(C) (plans must "limit[] the disconnect rate of all incoming [customer service] calls to 5 percent"); *Timeliness and Accuracy & Accessibility Studies*, at 1. By also including disconnect rates within the Accuracy & Accessibility Study, CMS double counts technical call drop issues, artificially depressing plans' Star Rating scores by double counting that factor. It is arbitrary and capricious for CMS to double count call drops in this way.

97.    Moreover, CMS rejected Humana's objections to the no-callbacks policy without reasoned decisionmaking of its own.

98.    Accordingly, Humana's 2025 Star Ratings for contracts impacted by calls D0900533 or D1100955 should be set aside. The Court should remand the matter to the agency with directions not to include calls D0900533 or D1100955 as incomplete calls under the CY 2025 Accuracy & Accessibility Study.

## Count II
## Call Where No Introductory Question Was Posed

99.    Plaintiffs reallege the allegations set forth in paragraphs 1-83 of this complaint as though fully set forth herein.

100.  CMS requires plan sponsors to make foreign language interpreters available to would-be enrollees "within 8 minutes of reaching the customer service representative." 42 C.F.R. §§ 422.111(h)(iii), 423.128(d)(1)(iii).

101.  The Accuracy & Accessibility Study proceeds in three relevant phases for foreign language calls: dial, connect, and introductory question. *2024 Technical Notes* 5. At the connect phase, the caller "determine[s] if [he] can reach a live [representative] at the plan who can assist [him] with [his] questions." *Id.* According to CMS guidance, "the call is connected" if the secret shopper "establish[es] contact with your CSR while speaking in a foreign language." *Id.* at 18. A secret shopper who never poses a question in a foreign language never reaches the CSR or establishes contact or a connection with the CSR within the meaning of CMS's guidance.

102.  The call is connected within the meaning of the guidance, the caller must "ask an introductory question" in the foreign language. *Id.*

103.  The duty to bring an interpreter on the line within 8 minutes only commences when the secret shopper poses an "introductory question" in a foreign language. When a secret shopper establishes an audio connection with an MAO's customer service representative but then remains silent and never poses an introductory question in a foreign language, the duty to bring an interpreter into the call is not triggered.

104.  Put another way, when "the introductory question [is] not asked," the "call center [can] not fail to answer it." *UnitedHealthcare v. CMS*, 2024 WL 4870771, at*4 (E.D. Tex. 2024). A secret shopper who remains silent has not tested what he is supposed to be testing: the call center's ability to assist non-English speakers with interpreters.

105.  The secret shopper in call C0701002 never asked an introductory question in a foreign language and instead remained on the line in silence for several minutes, without following CMS's prescribed script for test calls, before the call was disconnected. CMS's

decision to score call C0701002 as "unsuccessful" instead of invalidating it was inconsistent with its own guidelines and requirements for test calls. It also was arbitrary and capricious in its own right, in violation of the APA.

106. Moreover, CMS rejected Humana's objections to Hendall counting call C0701002 as incomplete without reasoned decisionmaking of its own.

107. Accordingly, Humana's 2025 Star Ratings for contracts impacted by call C0701002 should be set aside. The Court should remand the matter to the agency with directions to invalidate call C0701002 and refrain from counting it as an incomplete call under the CY 2025 Accuracy & Accessibility Study.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs ask the Court to enter judgment in their favor and:

(a.) Declare that CMS's policy of refusing callbacks after dropped calls and practice of refusing to invalidate calls lacking communication is unlawful for purposes of the Accuracy & Accessibility Study;

(b.) Set aside and vacate Humana's 2025 Star Ratings and remand the matter to CMS for recalculation of Humana's 2025 Star Ratings without application of the unlawful practices and policies identified above;

(c.) Set aside and vacate Humana's 2025 Star Rating for all contracts adversely impacted by call IDs D0900533 or D1100955 on the ground that CMS's policy of refusing callbacks after dropped calls is unlawful, and remand to the matter to CMS;

(d.) Set aside and vacate Humana's 2025 Star Rating for all contracts adversely impacted by call ID C0701002 on the ground that a secret shopper does not reach a customer service representative if no communication takes place, and remand the matter to CMS;

(e.) Award plaintiffs their costs and attorneys' fees as permitted by law;

(f.) Award plaintiffs such other and further relief as the Court may deem just and proper.

27

Dated: July 21, 2015                    Respectfully submitted,

                                        /s/ *John T. Sullivan*

                                        John T. Sullivan
                                           Texas Bar No. 24098485

                                        Winston & Strawn LLP
                                        2121 N Pearl Street, Suite 900
                                        Dallas, Texas 75201
                                        (214) 453-6498
                                        jsullivan@winston.com

                                        Michael B. Kimberly
                                           D.C. Bar No. 991549*

                                        Winston & Strawn LLP
                                        1901 L Street NW
                                        Washington, DC 20036
                                        (202) 282-5096
                                        mkimberly@winston.com

                                        Edward A. Day
                                           Illinois Bar No. 6332606*

                                        Winston & Strawn, LLP
                                        35 West Wacker Drive
                                        Chicago, Illinois 60601
                                        (312) 558-8106
                                        tday@winston.com

                                        *Counsel for Plaintiffs*

                                        * *pro hac vice* application forthcoming