IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

_____

HUMANA INC., and AMERICANS FOR
BENEFICIARY CHOICE,

     Plaintiffs,

v.

U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES; CENTERS FOR
MEDICARE & MEDICAID SERVICES;
ROBERT F. KENNEDY JR., in his official
capacity as Secretary of Health and Human
Services; and MEHMET CENGIZ OZ, in
his official capacity as Administrator of the
Centers for Medicare & Medicaid Services,

     Defendants.

Civil Action No. 4:25-cv-00779-O

**DEFENDANTS' CONSOLIDATED BRIEF IN SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO PLAINTIFFS' <u>MOTION FOR SUMMARY JUDGMENT</u>**

NANCY E. LARSON
ACTING UNITED STATES ATTORNEY

*/s/ Andrea Hyatt*
Andrea Hyatt
Assistant United States Attorney
Texas Bar No. 24007419
Burnett Plaza, Suite 1700
801 Cherry Street, Unit #4
Fort Worth, Texas 76102-6882
Telephone: 817.252.5230
Fax: 817.252.5458
Andrea.Hyatt@usdoj.gov

*Attorneys for Defendants*

## Table of Contents

I.    Summary .......................................................................................................... 1

II.   Background ..................................................................................................... 3

      A.    Medicare Advantage Program ................................................................. 3

      B.    Medicare Part C and D Quality Star Rating System ..................................... 5

      C.    Call Center Foreign-Language Interpreter and TTY Availability
            Measure ............................................................................................. 9

      D.    Appeals Process for Star Ratings and Quality Bonus Payment Status ....... 11

      E.    The Test Calls .................................................................................... 12

            1.    The "Silent Hold" Call ................................................................. 13

            2.    The Three Disconnected Calls ...................................................... 13

      F.    Humana Challenges CMS's Classification of the Test Calls ..................... 13

      G.    Humana's Quality Bonus Payment Appeals ............................................ 15

      H.    Procedural Context ............................................................................. 15

III.  Legal Standard ............................................................................................. 16

IV.   Argument and Authorities ............................................................................. 17

      A.    CMS Properly Categorized the Disconnected Calls as
            "Unsuccessful," and Plaintiffs' Methodological Challenges are
            Meritless. ......................................................................................... 18

            1.    Humana acknowledges that a call dropped by a call center
                  that then fails to call back should be marked unsuccessful .............. 18

            2.    Humana's arguments about the validity of the no-callback
                  policy are based on a regulation that has nothing to do with
                  the Star Ratings. ...................................................................... 24

            3.    The Star Ratings measure specifications do not establish
                  eligibility criteria ..................................................................... 27

i

4.    5 U.S.C. § 553(b) does not apply to Star Ratings measures. ...........29

5.    Humana misapprehends the role of 42 C.F.R. § 422.164, and
any procedural error was harmless....................................................32

6.    The policy against callbacks is not substantively arbitrary.............33

B.    CMS's Decision to Classify Silent Call as "Unsuccessful" was
Neither Arbitrary nor Capricious. ...............................................35

V.    Conclusion .............................................................................................39

# Table of Authorities

## <u>Cases</u>

*Consolo v. Fed. Mar. Comm'n*,
  383 U.S. 607 (1966) ................................................................................. 17, 23

*Girling Health Care, Inc. v. Shalala*,
  85 F.3d 211 (5th Cir. 1996) ............................................................................. 16

*Larson v. Geren*,
  2010 WL 11542078 (W.D. Tex. Apr. 14, 2010) ........................................... 16

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024) ......................................................................................... 30

*Mock v. Garland*,
  75 F.4th 563 (5th Cir. 2023) ...................................................................... 30, 31

*Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Auto Ins. Co.*,
  463 U.S. 29 (1983) ........................................................................................... 16

*Shalala v. Illinois Council on Long Term Care*,
  529 U.S. 1 (2000) ............................................................................................. 23

*UnitedHealthcare Benefits of Tex., Inc. v. Ctrs. for Medicare & Medicaid Servs.*,
  2024 WL 4870771 (E.D. Tex. Nov. 22, 2024) .............................................. 37

## <u>Statutes</u>

5 U.S.C.

  § 706 ............................................................................................................ 16, 33

  § 706(2) ............................................................................................................. 16

Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395*lll* .................... 3

42 U.S.C.

  § 1395c ................................................................................................................ 3

  § 1395d ......................................................................................................... 3, 12

  § 1395hh ...................................................................................................... 28, 29

  § 1395hh(a) ...................................................................................................... 27

  § 1395hh(a)(2) .................................................................................................. 28

  § 1395j ................................................................................................................ 3

  § 1395k ............................................................................................................... 3

  § 1395*l* ................................................................................................................ 3

## Statutes (*con.*)

42 U.S.C.

§ 1395w-21 *et seq* .................................................................................. 4

§ 1395w-21(b) ..................................................................................... 4

§ 1395w-22(a) ..................................................................................... 4

§ 1395w-22(a)(B)(i) ............................................................................ 29

§ 1395w-23(a)(1)(B)(ii) ....................................................................... 5

§ 1395w-23(a)(1)(A), (C) ................................................................... 4

§ 1395w-23(b) ..................................................................................... 32

§ 1395w-23(b)(2) ................................................................................ 9

§ 1395w-23(n) ..................................................................................... 5

§ 1395w-23(o)(1) ................................................................................ 8

§ 1395w-23(o)(3)(A)(i) ....................................................................... 8

§ 1395w-24(b)(1)(C) ....................................................................... 5, 8

§ 1395w-24(b)(1)(C)(v) ...................................................................... 8

§ 1395w-24(b)(2)(A) ........................................................................... 5

§ 1395w-101 *et seq.* ........................................................................... 4

§ 1395x(f)(3) ....................................................................................... 29

§ 1395x(k) ........................................................................................... 29

## Regulatory

42 C.F.R.

§ 422.16 ............................................................................................... 39

§ 422.66 ............................................................................................... 7

§ 422.111(h)(1)(iii) .................................................... 24, 25, 27, 29, 30

§ 422.160 ............................................................................................. 27

§ 422.162(b) ......................................................................................... 7

§ 422.164 ................................................................................ 26, 30, 32

§ 422.164(c) ......................................................................................... 9

§ 422.164(d) ......................................................................................... 9

## Regulatory (*con.*)

42 C.F.R.

§ 422.166(h)(2) ................................................................................ 11

§ 422.254 ............................................................................................ 5

§ 422.258 ............................................................................................ 5

§ 422.260 ......................................................................................... 5, 8

§ 422.260(a) ..................................................................................... 12

§ 422.260(c)(1)(i) ............................................................................ 12

§ 422.260(c)(2) ................................................................................ 12

§ 422.260(c)(2)(vi) .......................................................................... 12

§ 422.260(c)(2)(vii) ......................................................................... 12

§ 422.266(a)(2)(ii) ............................................................................. 8

§ 422.502(b)(1)(*i*)(D) ..................................................................... 28

§ 423.128(d)(1)(iii) ..................................................................... 27, 30

§ 423.128(d)(1)(iii)(B) .................................................................... 24

§ 423.182(b) ....................................................................................... 7

§ 423.186 ........................................................................................... 7

Contract Year 2019 Policy & Technical Changes to the MA Program, 83 Fed. Reg.
16,440 (Apr. 16, 2018) ........................................................ 6, 7, 26, 39

Medicare and Medicaid Programs; Contract Year 2022 Policy & Technical Changes to
the Medicare Advantage Program, Medicare Prescription Drug Benefit Program,
Medicaid Program, Medicare Cost Plan Program, & Programs of All-Inclusive Care
for the Elderly, 86 Fed. Reg. 5864 (Jan. 19, 2021) ................................ 24, 25

## Rules

Federal Rule of Civil Procedure 56 ................................................... 39

Federal Rule of Civil Procedure 5(b)(2) ........................................... 40

## <u>Other Authorities</u>

10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure: Civil 2d § 2733 (1983) ............................................................... 16

CMS, Advance Notice of Methodological Changes for Calendar Year ("CY") 2025 for MA Capitation Rates and Part C and Part D Payment Policies (Jan. 31, 2024) ............................................................................................... 7

CMS, Call Center Monitoring Webinar (Feb. 3, 2016) ...................................... 24

CMS, Fact Sheet - 2025 Medicare Advantage and Part D Star Ratings (Oct. 10, 2024) .... 7

## I.    Summary

This lawsuit arises from three instances where Plaintiff Humana, Inc.'s Medicare Advantage call center hung up on a caller seeking information. As part of its operation of Medicare Advantage plans, Humana runs a call center that provides customer service to Medicare beneficiaries, including foreign-language speakers. Each year, the Centers for Medicare & Medicaid Services (CMS) notifies Medicare Advantage Organizations (MAOs) like Humana that it will use test callers to check the experience of Medicare beneficiaries who call its plans. CMS notifies MAOs in advance when the study will run, what languages will be tested, and what criteria the MAOs must satisfy to have test calls marked "successful." The results of this Call Center Study are part of the data CMS uses to calculate the Star Ratings for each Medicare Advantage contract on a congressionally mandated scale of one to five stars. Congress also requires CMS to base certain financial incentives on a plan's Star Rating. Every MAO knew well in advance that its performance on the Call Center Study would affect its Star Rating and knew the financial incentives associated with that rating.

Humana challenges three calls that CMS marked "unsuccessful" in 2024.[1] But the undisputed facts show that the calls that Humana challenges were unsuccessful by any measure. In two of them, callers were placed on hold to await an interpreter and had the line abruptly disconnect through no fault of the callers. In the third, a caller heard nothing

---

[1] The fact that Humana challenges only these three calls does not mean that every other call Humana's call center received in 2024 was "successful." Rather, it reflects Humana's identification of the challenges it chose to pursue. Indeed, Humana asked the Agency to invalidate a fourth unsuccessful call but has not pursued that challenge in litigation.

after the automated answering system completed its menu of options. That caller continued to hear nothing until once again the line—through no fault of the caller—went dead. Although Humana does not dispute these facts about the calls, it nevertheless seeks a judicial declaration overturning CMS's rating of these calls as "unsuccessful."

Humana has already asked this Court prematurely to change its grade. While briefing was ongoing in its original lawsuit, Humana was pursuing an internal administrative appeal at CMS, challenging the same three calls and seeking the same relief. On July 18, 2025, this Court granted Defendants' motion to dismiss without prejudice, holding that "Plaintiffs admittingly did not exhaust the appeal process and thus the Court cannot proceed to the merits of this action." Order 5, Case No. 24-cv-01004-O (N.D. Tex. July 18, 2025, ECF No. 56). The agency appeals process ended in late April, with both a CMS Reconsideration Official and a CMS Hearing Officer concluding that CMS was correct in its initial assessment of the failed calls, and the CMS Administrator declining review. Humana now brings a new complaint, challenging the Agency's final disposition of its properly channeled and exhausted claims.

This Court should rule in Defendants' favor because Plaintiffs have not carried their burden of showing that CMS's actions were unsupported by substantial evidence on the record taken as a whole. To the contrary, the only evidence in the record supports CMS's classification of each call as "unsuccessful," and Humana (despite having repeated opportunities to do so) did not provide the Agency with any evidence for its theories of why the calls should be invalidated and removed from the dataset.

Humana offers no defense of its performance in fielding any of the three calls at issue. It "agrees that dropped calls pose risks to beneficiary access." Administrative Record (AR) 18, ECF No. 26. Yet Humana insists that these particular dropped calls should not affect its score on the "Accuracy and Accessibility" component of the Medicare Advantage Star Ratings. This lawsuit is Humana's attempt to have a court absolve it of responsibilities for its own shortcomings in providing the barest minimum of customer service to Medicare beneficiaries. This Court should decline the invitation and grant summary judgment to Defendants.

## II.    Background

### A.    Medicare Advantage Program

Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395*lll* (the "Medicare statute"), establishes the Medicare program, a federally funded and administered health insurance program for eligible elderly and disabled persons and certain individuals with end-stage renal disease. *See* 42 U.S.C. § 1395c. The Secretary administers the Medicare program through CMS, a component agency of the United States Department of Health and Human Services.

The Medicare program is divided into four major components.

1. *Part A*, the hospital insurance benefit program, provides health insurance coverage for certain inpatient hospital care, post-hospital care in a skilled facility, post-hospital home care services, and other related services. *See* 42 U.S.C. §§ 1395c, 1395d.

2. *Part B*, the supplemental medical insurance benefit program, generally pays for a percentage of certain medical and other health services, including physician services, supplemental to the benefits provided by Part A. *See* 42 U.S.C. §§ 1395j, 1395k, 1395*l*.

3. *Under Part C*, the Medicare Advantage program, a Medicare beneficiary can elect to receive his or her Medicare benefits through a public or private healthcare plan. *See* 42 U.S.C. § 1395w-21 *et seq.*

4. *Part D* is the voluntary prescription drug benefit program.

This case primarily concerns two programs under which the federal government pays health-insurance companies to provide coverage to participating beneficiaries. Under Medicare Advantage or Medicare Part C, private insurers provide coverage that beneficiaries would otherwise receive through Parts A and B (sometimes known, collectively, as "traditional" Medicare). *Id.* § 1395w-22(a). These insurers, known as Medicare Advantage Organizations ("MAOs"), contract with the Government to provide coverage in a particular geographic area. Beneficiaries can then choose among the plans available where they reside. *Id.* § 1395w-21(b). The Government pays MAOs a predetermined sum for providing coverage to each beneficiary, based in part on the demographic and health characteristics of that beneficiary. *Id.* § 1395w-23(a)(1)(A), (C). Under Medicare Part D, the federal government contracts with insurance companies (called "sponsors"), which provide subsidized prescription drug coverage to beneficiaries. *See id.* § 1395w-101 *et seq.* Many insurers operate plans under Parts C and D, and the differences between the programs are not material to this litigation. The Government's brief will therefore refer to insurers who provide Medicare coverage as "MAOs."[2]

---

[2] In many circumstances, there are substantively identical regulations for Part C and Part D. In this brief, Defendants frequently cite only the Part C regulations where they are substantively identical.

To calculate payments to MAOs, CMS first determines a "benchmark," based on the per capita cost of covering Medicare beneficiaries under Parts A and B in the relevant geographic area. *Id.* § 1395w-23(n); 42 C.F.R. § 422.258. Each MAO then submits a "bid," telling CMS what payment the MAO will accept to cover a beneficiary with an average risk profile in that area. 42 C.F.R. § 422.254. If the insurer's bid is less than the benchmark, the bid becomes the insurer's "base payment"—the amount it is paid for covering a beneficiary of average risk—and the insurer also receives a portion of the amount by which its bid is lower than the benchmark as a "rebate" that the MAO can use to fund supplemental benefits for beneficiaries or reduce plan premiums. 42 U.S.C. § 1395w-24(b)(1)(C); 42 C.F.R. § 422.260. If the MAO's bid is greater than the benchmark, then the benchmark becomes the insurer's base payment, and the insurer must charge beneficiaries a premium to make up the difference. *See* 42 U.S.C. §§ 1395w-23(a)(1)(B)(ii), 1395w-24(b)(2)(A).[3]

## B.  Medicare Part C and D Quality Star Rating System

Congress has instructed that "[t]he quality rating for a [Medicare Advantage] plan shall be determined according to a 5-star rating system (based on the data collected under section 1395w-22(e) of this title)." 42 U.S.C. § 1395w-23(o)(4)(A). To provide beneficiaries with information on the quality of Medicare Advantage plans and consistent with the statute, CMS uses a Star Ratings system that rates each plan on a scale from 1 to 5 "stars" based on 30 or 42 quality measures, depending on whether the plan is Medicare

---

[3] This bidding process is similar for Part D plans.

Advantage-only or also includes Part D coverage. *See* AR113 (2025 Part C & D Star Ratings Technical Notes). These quality measures assess different aspects of health outcomes, patient experience, and care quality within the following five broad categories:

1. Outcome measures that reflect improvements in a beneficiary's health and that are central to assessing quality of care;

2. Intermediate outcomes that reflect actions taken which can assist in improving a beneficiary's health status, such as control of blood sugar in diabetes care where the related outcome of interest would be better health status for beneficiaries with diabetes;

3. Patient experience measures that reflect beneficiaries' perspectives on the care they receive from a plan;

4. Access measures that reflect processes and issues that could create barriers to receiving needed care, such as whether a plan makes timely decisions about benefit appeals; and

5. Process measures that capture the health care services provided to beneficiaries that can assist in maintaining, monitoring, or improving their health status.

AR121.

To calculate these ratings measures, CMS uses a variety of different data sources. These data sources include:

- administrative and medical record review data collected as part of the Healthcare Effectiveness Data and Information Set ("HEDIS");

- survey-based data from the Health Outcomes Survey and from the Consumer Assessment of Healthcare Providers and Systems ("CAHPS"); and

- CMS performance measures, such as the Call Center Measures.

*See* Contract Year 2019 Policy & Technical Changes to the Medicare Advantage Program, 83 Fed. Reg. 16,440, 16,520, 16,525 (Apr. 16, 2018). For measures not based on information from CAHPS, CMS uses a clustering algorithm that creates four "cut

points" in the data to separate plans into five different "star" levels. *See* AR129-30. CMS determines each plan's overall rating by calculating a weighted average of the plan's Star Ratings on each of the different individual measures. *Id*. at 132-34.

CMS began releasing Star Ratings for Medicare Advantage contracts in 2008. *See* 83 Fed. Reg. at 16,520. CMS publishes the Star Ratings each October for the upcoming year at the contract level, with each plan offered under that contract assigned the contract's rating. *See* 42 C.F.R. §§ 422.162(b); 422.166; 423.182(b); and 423.186. This case concerns the 2025 Star Ratings issued in October 2024. CMS, Fact Sheet - 2025 Medicare Advantage and Part D Star Ratings (Oct. 10, 2024) *available at* https://www.cms.gov/medicare/health-drug-plans/part-c-d-performance-data.

The Star Ratings system is intended to assist beneficiaries in finding the best Medicare Advantage and Part D plans for their needs by providing information "that is a true reflection of the plan's quality and encompasses multiple dimensions of high quality care." 83 Fed. Reg. at 16,520; *see also* CMS, Advance Notice of Methodological Changes for Calendar Year ("CY") 2025 for Medicare Advantage Capitation Rates and Part C and Part D Payment Policies, at 111 (Jan. 31, 2024), *available at* www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/Announcements-and-Documents.

Star Ratings do more than provide valuable information to beneficiaries when selecting an MAO. Congress has provided that a plan contract's overall Star Rating should also affect payments to the MAO in two ways. First, plans that earn an overall rating of 4 stars or higher qualify for Medicare Advantage Quality Bonus Payments in the form of an increased benchmark for the contract year following the ratings year (*e.g.*, the

2025 Star Ratings can increase the Medicare Advantage bidding benchmarks for contract year 2026). *See* 42 U.S.C. § 1395w-23(o)(1) (increasing, for qualifying plans, the applicable percentage that calculates the benchmark); § 1395w-23(o)(3)(A)(i) (providing that a qualifying plan is one that earns a rating of 4 stars or higher). This increased benchmark in turn can allow a Medicare Advantage plan to increase its bid, receive higher rebates, or lower premiums. *See id.* § 1395w-24(b)(1)(C); 42 C.F.R. § 422.260.

Second, Star Ratings affect the level of rebate received by plans that bid below their benchmarks for the contract year following the ratings year (*e.g.*, the 2025 Star Ratings are used to set plans' rebate percentages for contract year 2026). Plans that earn an overall rating of 4.5 stars or higher receive a rebate of 70% of the amount by which their bid is lower than the benchmark, while plans that earn 3.5 or 4 stars receive a rebate of 65% of that amount, and plans that earn less than 3.5 stars are eligible for a rebate of 50% of that amount. 42 U.S.C. § 1395w-24(b)(1)(C)(v) (listing the "final applicable rebate percentage[s]" by rating); 42 C.F.R. § 422.266(a)(2)(ii) (same).

Each year, CMS circulates to plans (and displays on its website) Technical Notes that provide details about the current year's Part C & D Star Ratings. *See* 2025 Star Ratings Technical Notes, AR113. Among other things, these Technical Notes include details about the measures that comprise the Star Ratings, how those measures will be weighted, what the cut points for each measure are, and how CMS assesses each measure. *See generally id*. Before each year's Technical Notes are finalized, plans are informed and have the opportunity to comment about the measures in upcoming Star Ratings through the rulemaking process and the Advanced Notice process. *See* 42 C.F.R.

§ 422.164(c), (d); *see also* 42 U.S.C. § 1395w-23(b)(2) ("Secretary shall provide for notice . . . of proposed changes to be made in the methodology . . . and shall provide [MAOs] an opportunity . . . to comment on such proposed changes.").

## C.    Call Center Foreign-Language Interpreter and TTY Availability Measure

Since 2016, CMS has included among the performance measures in its Star Ratings a measure of how well health plan call centers process calls from beneficiaries with limited English language proficiency or a hearing or speech disability. CMS provides notice to MAOs about how it evaluates performance on this measure for purposes of the Star Ratings. For example, CMS publishes the Medicare Part C & D Call Center Monitoring Accuracy and Accessibility Study Technical Notes (hereinafter, "Technical Notes"), which explain how the study was conducted and how CMS used the results to calculate each plan contract's raw score on the measure.[4] *See* AR74. The 2025 Technical Notes were published in June 2024, after the conclusion of the study. AR75. CMS includes a "change log" showing differences from previous iterations of the study.

The Technical Notes explain that the study was conducted through a random sample of anonymous calls made to each health plan's designated call center where the test caller has no advance knowledge of the call center's Limited English Proficiency (LEP) or TTY services. AR76. The Technical Notes also describe the protocol for testing foreign language interpreter accessibility and determining which of the three outcomes

---

[4] These Technical Notes are specific to the Call Center study, as opposed to the broader C&D Star Ratings Technical Notes (AR113) that describe the Star Ratings measures more broadly.

that call may have: (1) connected; (2) complete; or (3) unsuccessful. AR79. The Notes

explain the protocol for how a testing call will begin:

> If we are testing interpreter availability, we place the call in a foreign
> language and wait for the CSR [customer service representative] to bring an
> interpreter to the phone to assist the CSR in answering our introductory
> question. We permit eight minutes for the CSR to connect to an interpreter
> and answer our introductory question. An example of an introductory
> question is, "Are you the right person to answer questions about [Plan
> name's] health benefits?"

AR 79. The Notes then explain how, depending on what happens next on the call, the call

will be considered to be either "connected" or "complete":

> The call is considered connected when the caller connects with the CSR.
> The interpreter availability/LEP measure is considered completed when the
> CSR, via an interpreter, provides an affirmative response to the
> introductory question . . . within eight minutes. Alternatively, if a CSR
> happens to speak the foreign language we are testing, and that
> representative is able to answer the questions without an interpreter's
> assistance, this too would count as a completed interpreter availability/LEP
> measure outcome. In order for the interpreter availability/LEP measure to
> be complete, there must be true communication, meaning the CSR must
> answer the introductory question and be able to converse in the foreign
> language we are testing with or without an interpreter's assistance.

AR79. Finally, the Notes explain that a call "will be scored as unsuccessful if we are not

able to connect to a live CSR at the plan during that scheduled call or if the CSR cannot

assist us with our questions or cannot forward our call to someone who can assist."

AR78.

The Technical Notes explain that scores on interpreter availability are combined

with scores on TTY functionality for Star Ratings purposes. AR76-77. The raw score is

calculated as "the number of completed contacts with the interpreter and TTY divided by

the number of attempted contacts. Completed contact with an interpreter is defined as

establishing contact with an interpreter and confirming that the customer service representative can answer questions about the plan's . . . benefit within eight minutes." AR83.

In addition, CMS publishes annually a memorandum providing further guidance on how CMS monitors call center performance and how MAOs can prepare for the monitoring study. AR64-73. For the year in question, the memorandum explained that the foreign languages being tested in 2024 were unchanged from the prior year and would include Spanish, Cantonese, Mandarin, Vietnamese, French, and Tagalog. AR65. The memorandum reiterated that "[i]nterpreter availability is defined as the ability of a caller to communicate with someone and receive answers to questions in the caller's language," and that "[i]nterpreters must be able to communicate responses to the call surveyor in the call center's non-primary language about the plan sponsor's Medicare or Medicare-Medicaid benefits." AR65. The memorandum also notifies MAOs that "[i]n the event that an organization believes that CMS may have miscalculated its call center results . . . , it may bring the relevant information to CMS' attention and ask for a review of the results." AR70.

## D.    Appeals Process for Star Ratings and Quality Bonus Payment Status

CMS provides for two plan preview periods before the annual release of each Star Ratings in October. *See* 42 C.F.R. § 422.166(h)(2). During the first plan preview in August, CMS asks Part C and D plan sponsors to closely review the Star Ratings methodology and their posted numeric data for each measure. The second plan preview in September includes any revisions made as a result of the first plan preview and provides

a preview of the preliminary Star Ratings for each measure, domain, summary rating, and overall rating. During the second plan preview, CMS asks Part C and D sponsors again to closely review the methodology and their posted data for each measure, as well as their preliminary Star Rating assignments. This is an informal administrative process in which MAOs send any comments or questions to CMS by email and CMS responds in kind.

CMS regulations also provide for a formal appeal process after the Star Ratings have been published that allows MAOs to "appeal quality bonus payment status determinations." 42 C.F.R. § 422.260(a). An MAO must first seek reconsideration "by providing written notice to CMS within 10 business days of the release of its [quality bonus payment] status." *Id*. § 422.260(c)(1)(i). The MAO may appeal an adverse decision by the reconsideration official via an informal hearing request. *Id*. § 422.260(c)(2). A hearing officer then issues a decision to the MAO. *Id*. § 422.260(c)(2)(vi). The hearing officer's decision is then subject to review and modification by the CMS Administrator within 10 business days of issuance. *Id*. § 422.260(c)(2)(vii). If the Administrator does not review and issue a decision within 10 business days, the hearing officer's decision is final and binding. *Id*.

**E.    The Test Calls**

Like all MAOs, Humana received test calls under the Part C & D Call Center Monitoring Accuracy and Accessibility Study between February and June 2024. During the September 2024 plan preview, Humana challenged four foreign-language calls that it said had been incorrectly deemed "unsuccessful." AR1, AR17-18.

### 1. The "Silent Hold" Call

In one of the challenged calls, CMS's contemporaneous data showed that the test caller was placed on a silent hold and the call disconnected after about five-and-a-half minutes. AR1; 9.[5] Humana alleged that "[t]he CMS caller remained silent throughout the duration of the call," and Humana stated its opinion for why the call should not count: "We do not believe this call should be considered connected." AR1.

### 2. The Three Disconnected Calls

In the three remaining calls, a customer service representative ("CSR") put the test caller on hold to get an interpreter, but the call center terminated the call before an interpreter joined. AR17-18.

Humana "agrees that dropped calls pose a risk to beneficiary access." AR18. Humana nonetheless urged CMS to exclude the calls from the study because, Humana speculated, it would have been able to complete the measure had it been permitted to call the test caller back. AR18-19. There is no evidence in the record that Humana attempted a callback in any of these instances.

## F. Humana Challenges CMS's Classification of the Test Calls

During the Plan Preview Period, CMS denied Humana's requests to reclassify all four calls. With respect to the silent-hold call, CMS reviewed the call log and confirmed that (1) the test caller dialed the proper number, and (2) the call was answered by the call

---

[5] The data is included in the Excel spreadsheet named "03.A Attachment SII_RawCallLog_2024_Full_C0701002.xlsx."

center's Interactive Voice Response system. AR13. The data also showed that the call disconnected and that the caller did not initiate the disconnect. *Id.* With respect to the three disconnections, CMS explained that it "does not allow callbacks from the plan as all questions should be answered in a single call." AR36. For those three calls, CMS's review of the data showed that the test caller did not initiate the disconnect. *Id.* CMS further noted that its guidance did not permit revisions based on challenges to the methodology. *Id.*

In early October 2024, shortly before the Star Ratings were due to be published, Humana escalated its complaints within CMS during the plan preview process. The Deputy Group Director of the Medicare Drug Benefit and C & D Data Group in CMS's Center for Medicare considered and declined Humana's request to change the Star Ratings. With respect to the silent-hold call, he explained via email on October 3, 2024 that "[t]he data CMS has provided shows that the interviewer believed they were in a silent hold as they didn't hear anything, and the plan initiated the disconnect." AR466. He also reiterated that "CMS has explained that for the study all answers are required to be given on the single call." *Id.* The then-Director of the Center for Medicare told Humana via email on October 7, 2024 that CMS would "not be making any changes that would impact the Stars that will [be] released on or around 10/10." AR468. She also "reiterate[d] that the quality bonus payment appeals process is available to you, which gives you the opportunity to lay out all the information." *Id.*

### G.    Humana's Quality Bonus Payment Appeals

Humana sought review via the Quality Bonus Payment appeals process of the Agency's determination that three of its calls were unsuccessful. On December 3, 2024, it sent the CMS Reconsideration official a reconsideration form and a letter explaining its position. AR 327-31. CMS responded with a Technical Report and appendices on January 15, 2025. AR 343. The Reconsideration Official upheld CMS's initial determination on January 31, 2025. AR 332. Humana then sought review from a Hearing Officer on February 14, 2025, again via an informal hearing form and a letter, this time including attachments. AR 367. CMS replied on March 11, 2025, via a Memorandum in Support of Denial of Humana's Appeal and supporting documentation. AR 391. The Hearing Officer denied Humana's appeal on April 14, 2025. AR 456-60. The Administrator declined to review the Hearing Officer's decision on April 23, 2025. AR 461-63.

### H.    Procedural Context

Plaintiffs first sought to challenge CMS's disposition of the calls via a Complaint filed on October 18, 2024. Compl., Case No. 4:24-cv-1004-O (N.D. Tex. Oct. 18, 2025, ECF No. 1). They later amended their Complaint, and the parties cross-moved for summary judgment on the Amended Complaint, with Defendants also filing a Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(1) as part of their cross-motion. This Court granted Defendants' Motion to Dismiss without prejudice on July 18, 2025. Order, Case No. 4:24-cv-1004-O (N.D. Tex. July 18, 2025, ECF No. 56).

Plaintiffs filed a complaint in this action on July 21, 2025. ECF No. 1. They moved for summary judgment on July 29, 2025. ECF No. 16.

### III.    Legal Standard

"Summary judgment is [the] appropriate procedure for resolving a challenge to a federal agency's administrative decision when review is based upon the administrative record, even though the Court does not employ the standard of review set forth in the rule governing summary judgment motions." *Larson v. Geren*, No. SA-08-CA-722, 2010 WL 11542078, at *4 (W.D. Tex. Apr. 14, 2010) (internal quotation marks omitted), *aff'd*, 432 F. App'x 356 (5th Cir. 2011). The Fifth Circuit has "consistently upheld, without comment, the use of summary judgment as a mechanism for review of agency decisions." *Girling Health Care, Inc. v. Shalala*, 85 F.3d 211, 214 (5th Cir. 1996). "Judicial review has the function of determining whether the administrative action is consistent with the law—that and no more." *Id.* (quoting 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure: Civil 2d § 2733 (1983)).

In this action challenging CMS's fact finding, judicial review is governed by the standards of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. The APA allows a federal court to overturn an agency's fact finding if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). Where, as is the case here, the parties' disagreement comes down to a dispute over the agency's fact finding, courts traditionally apply the deferential standard from *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto Ins. Co.*, 463 U.S. 29, 43 (1983):

> The scope of review under the "arbitrary and capricious" standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made."

The *State Farm* standard is satisfied if the final agency finding is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 619–20 (1966) (internal quotation marks and citation omitted). The standard "is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Id.* at 620.

## IV.     Argument and Authorities

Everyone agrees that the CMS test caller in each of the three calls at issue was unable to pose a question, through a foreign-language interpreter, to a customer service representative. The calls were quite obviously "unsuccessful" in that regard: Humana's call center failed in its core function of ensuring that callers could obtain assistance. Humana agrees that "dropped calls pose risks to beneficiary access." AR18. Humana nonetheless urges this Court to hold that the unsuccessful calls should be "invalidated"— i.e., removed from the dataset altogether. Humana does not meet its burden of demonstrating that CMS acted arbitrarily or capriciously when classifying any of the calls as "unsuccessful."

A.    **CMS Properly Categorized the Disconnected Calls as "Unsuccessful," and Plaintiffs' Methodological Challenges are Meritless.**

1.    **Humana acknowledges that a call dropped by a call center that then fails to call back should be marked unsuccessful.**

There is no dispute about what happened on the two disconnected calls. For call D1100955, the customer service representative "put [the test caller] on hold to get an interpreter with music playing in the background when the line unexpectedly disconnected by the plan." AR17. The data for the call confirms this. AR30.[6] For call D0900533, the customer service representative "put [the test caller] on hold for interpreter. Called person hung up while hold music played." AR27. Once again, the underlying data confirms this. AR30.[7] In its appeal to the Hearing Officer, Humana claimed—without evidence—that "both calls dropped because of faulty service from the third-party telecommunication service provider." AR372.[8] Humana could have provided evidence for this claim to the Hearing Officer, but it did not. The only evidence in the record—far more than the required "substantial evidence"—supports CMS's finding that the call disconnection was Humana's fault.

---

[6] The data for this call is included in an Excel spreadsheet with the file name "03.A Attachment SII_RawCallLog_2024_Full_H1019-H0028.xlsx."

[7] The data for this call is included in an Excel spreadsheet with the file name "03.A Attachment SII_RawCallLog_2024_Full_H1019-H0028.xlsx."

[8] Five days later, in a filing in this Court, Humana hypothesized that the calls may have failed due to "an ISP connectivity issue on the secret shopper's end" or a "power outage." Pls.' Consol. Reply 25-26, Case No. 4:24-cv-1004-O (N.D. Tex. Feb. 19, 2025, ECF No. 41). Humana has never presented any evidence supporting its shifting theories for why it disconnected the calls, and there is substantial evidence in the record (in the form of CMS's call logs) that the disconnection occurred on Humana's end. There is no basis for this Court to disturb the Agency's determination on substantial evidence review.

Humana responds that call disconnections are a "fact of life," and its call center has a "standard protocol" based on "industry best practice" for addressing them: "the representative [is] to attempt an immediate callback." Mem. in Supp. of Mot. for Summ. J. ("Pls. Mot.") 28, ECF No. 17. But the record here is, once again, undisputed: Humana did not attempt a callback for either call D1100955 or D0900533. It ignored its standard protocol and industry best practice. Neither test caller was able to reach an interpreter within the required eight minutes, and CMS deemed the calls unsuccessful.

Plaintiffs now blame defendants for Humana's abandonment of its own standard protocol. In a declaration never submitted to the agency, Humana tells this Court that "Humana's customer service representatives . . . generally know when they are speaking with a CMS test caller rather than a real-world caller" because "CMS callers follow standard scripts that are readily identified" and "typically place multiple test calls from the same phone number." App. in Supp. of Pls.' Mot. for Summ. J. ("Pls. App.") 14, ECF No. 19 (Decl. of Marla Sanders ("Sanders Decl.") ¶¶ 4-5, ). Humana also says that "a representative speaking with a CMS test caller must deviate from Humana's standard sales script . . . and thus will refrain from requesting callback information." *Id.* ¶ 5. So the "customer service representatives who handled calls D1100955 and D0900533 did not attempt callbacks after the calls were disconnected because Humana's standard practice is not to attempt callbacks to CMS test callers." *Id.* ¶ 8. But, Humana assures the Court, if "CMS or its contractors permitted callbacks . . . the customer service representatives who handled calls D1100955 and D0900533 would have been required to attempt callbacks within the eight-minute time period." *Id.* ¶ 9. To summarize: Humana has a separate

procedure for CMS test calls, which it claims to have established in response to CMS's allegedly unlawful no-callback policy, and its CSRs would have attempted callbacks but for the no-callback policy.

There are two separate problems with Humana's argument: it provides no evidence that it contemporaneously identified the calls at issue as test calls, and it does not show that its hypothetical callbacks would have happened at all, much less resulted in a successful grade.

Humana's sworn declaration conspicuously avoids saying that it knew at the time of the calls that D1100955 and D0900533 were test calls. It purportedly has two ways of identifying CMS calls: an "automatic number identification system" that tracks recycled numbers and standard scripts used by test callers. Pls. App. 14 (Sanders Decl. ¶ 4(a)-(b)). But while Humana says that call C0701002 was its sixth call from the same number (*id.* ¶ 4(b)), it says nothing about either call D1100955 or D0900533 using a number with which Humana's automated system was familiar. To the contrary: Humana's declarant "recently"[9] dialed the numbers associated with those two calls and received a message that the call could not be completed. No matter—Humana claims it can also identify CMS test calls by a readily identified script. *Id.* ¶ 4(a). But that script must be spoken "in a foreign language" through an interpreter (AR 90-91), and it is undisputed that there was never an interpreter on the line for either call D1100955 or D0900533. Humana says it

---

[9] The Sanders Declaration is virtually identical to a declaration filed in the previous litigation. Decl. of Marla Sanders, Case No. 4:24-cv-1004-O (N.D. Tex. Feb. 19, 2025, ECF No. 41-1). Presumably, the attempt to call the number associated with call C0701002 was recent as of the original filing of the declaration.

can identify test calls, but the methods it describes for identifying them do not apply to these calls, and Humana never says that it knew at the time that calls D1100955 or D0900533 were in fact test calls. Yet it—once again, indisputably—did not provide an interpreter at all, much less within eight minutes, and did not attempt a callback. It is hard to imagine how any Medicare beneficiary would deem such a customer service experience "successful," and it is hardly a surprise that CMS marked the call "unsuccessful."

This Court does not have to take Defendants' word for it. Humana agrees. "If a call center drops a call and then fails to call back or takes too long calling back, the call of course should be scored unsuccessful." Pls. Mot. 28 (emphasis added). That is what happened here: Humana's call center dropped two calls and did not attempt callbacks. CMS, "of course," marked the calls unsuccessful.

The second problem with Humana's argument is one it also acknowledges. Plaintiffs assert that a call "should not be scored unsuccessful when the call center is able to call back and bring an interpreter on the line in fewer than eight minutes from the initial foreign-language connection." *Id.* A successful post-disconnection call requires accomplishment, not merely an attempt. But the only evidence Humana has provided to this Court—in the form of a declaration never submitted to the Agency—says that the "representatives who handled calls D1100955 and D0900533 would have been required to attempt callbacks within the eight minute period." Pls. App. 15 (Sanders Decl. ¶ 9) (emphasis added). Humana cannot guarantee that its representatives will abide by its requirements—after all, it has failed to show that the representatives who fielded

D0900455 and D1100955 followed the requirements, even though the indicia it relies on to identify a CMS call were absent. And even if a representative does follow standard procedure, there is no guarantee of success and no evidence that success is even a reasonable possibility under the circumstances of the challenged calls.

This Court can and should end its analysis of the disconnected calls here. By submitting a supplemental declaration to this Court that it never offered to the Agency, Humana has tacitly acknowledged what is already plain from the record: it provided no evidence, only argument, to the Agency during the review period. *See* AR373 ("If CMS had not imposed the unlawful no-callback policy, the Humana CSRs in calls D1100955 and D0900533 would have been able to re-establish the connection with the call surveyor after the calls dropped by calling back."). There is substantial—indeed, undisputed— evidence in the administrative record that Humana hung up on two callers while they were waiting for interpreters and thereby failed to satisfy the criteria for a successful call. This is what the Hearing Officer found: "In the case of the calls at issue, CMS provided evidence, through call logs and notes, that attempts were validly made, yet contacts were not completed as outlined in the technical notes." AR460. This decision was entirely sensible in light of the record before the hearing officer, in which Humana offered only hypotheticals about what its representatives "would have been able" to accomplish but for a CMS policy.

Humana says that its declaration is offered "to demonstrate traceability and standing." Pls. Mot. 18 n.2. Even if this Court accepts the declaration for that limited

purpose,[10] the Court should conclude that the declaration undermines Plaintiffs' arguments on both counts. What the declaration shows is that Humana did not know that the disconnected calls were test calls, cannot explain why it failed to follow its standard callback procedure, and cannot—contrary to its attorneys' assertions—state with any confidence that it would have satisfied the criteria for a successful call had it been permitted a callback.

The Court is left with Humana's acknowledgement that a call exactly like these two "of course should be scored unsuccessful," an administrative record bereft of any evidence to support Humana's version of events, and a convoluted chain of hypotheticals concluding in speculation about what customer service representatives would have been required to attempt. This is far from sufficient to overturn an agency determination on substantial evidence review, and this Court can and should affirm CMS's disposition of calls D1100955 and D0900533 on the basis that it is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolo*, 383 U.S. at 619–20 (1966) (internal quotation marks and citation omitted). Indeed, because the no-callback policy did not cause Humana to fail these calls (for the simple reason that Humana did not attempt a callback and has not shown that its failure to

---

[10] Defendants have not challenged Humana's standing. Under *Shalala v. Illinois Council on Long Term Care*, Humana "remains free . . . to contest in court the lawfulness of any regulation or statute upon which an agency determination depends." 529 U.S. 1, 23 (2000). But that does not imply that they may introduce extra-record evidence to show that CMS determination depended on the no-callback policy; any evidence to that effect could have been provided to the Agency during the review process. It is irrelevant here, however, because Defendants have shown that the declaration does not demonstrate that Humana's alleged injury is traceable to the no-callback policy. Whether or not this Court considers extra-record materials, Humana cannot make the showing required to prevail.

attempt one was due to the policy), this Court does not need to consider Humana's remaining arguments against the no-callback policy.

2. **Humana's arguments about the validity of the no-callback policy are based on a regulation that has nothing to do with the Star Ratings.**

CMS has been conducting its Accuracy and Accessibility Study via test calls to MAO call centers since at least the 2016 Plan Year. *See* CMS, Call Center Monitoring Webinar (Feb. 3, 2016), available at https://www.cms.gov/Medicare/Prescription-Drug-Coverage/PrescriptionDrugCovContra/Downloads/Call-Center-Monitoring-Webinar-.pdf. The interpreter availability "for 80 percent of incoming calls . . . within 8 minutes" requirement at 42 C.F.R. § 422.111(h)(1)(iii), which Humana says "underl[ies] the Star Ratings measures, specifically including the foreign-language interpreter requirement," Pls. Mot. 20, was added in 2021 and became effective only beginning January 1, 2022.[11] *See* 86 Fed. Reg. 5864, 6005-08 (Jan. 19, 2021). And in promulgating that provision, CMS stated that "performance is measured against this standard in our current monitoring and oversight activities." *Id.* at 6006. CMS thus chose the "eighty percent within eight minutes" standard in part because MAOs were already familiar with the eight-minute requirement from having it be a component of the Star Ratings measurements. Humana's argument that the Star Ratings somehow implement § 422.111(h)(1)(iii) is almost exactly backward: when CMS decided to "delineat[e] more explicit minimum performance standards for MA and Part D customer service call centers," 86 Fed. Reg. at 6005, it

---

[11] In this brief, Defendants often refer to this regulation (and its identical counterpart for Part D at 42 C.F.R. § 423.128(d)(1)(iii)(B)) as the "minimum standards regulation."

established a minimum performance standard based on a metric with which MAOs were already familiar. But the Star Ratings measures do not "define[] the duty of an MAO to comply with" the minimum performance standard. The Star Ratings included an interpreter availability measure well before the minimum standards regulation existed, and it is the agency's Star Ratings guidance that describes how measures will be scored.

The disconnect between the minimum standards regulation and the Star Ratings measures becomes more apparent when comparing the purposes of the two provisions. As is clear from the text of the regulation and its accompanying Federal Register preamble, § 422.111(h)(1)(iii) sets a "minimum performance standard" for call centers; they must provide an interpreter within eight minutes for 80% of incoming calls. Star Ratings, by contrast, do not set minimum performance standards—they explicitly compare a contract's performance on a variety of metrics against its peers. The 80% minimum standard in § 422.111(h)(1)(iii) is incoherent as applied to Star Ratings— further evidence, if any were needed, that the Star Ratings measurements do not implement the minimum standards regulation.

In a 2018 rulemaking—again, several years before it promulgated the call center minimum standards regulation—CMS formalized its existing process for notifying MAOs about the Star Ratings criteria. CMS described how it had historically "used the draft and final Call Letter, which are attachments to the Advance Notice and final Rate Announcement respectively, to propose for comment and finalize changes to the quality

Star Ratings system."[12] 83 Fed. Reg. 16,440, 16,524 (Apr. 16, 2018) (footnote omitted).

CMS "proposed, broadly stated, to codify the current quality Star Ratings system uses,

methodology, measures, and data collection beginning with the measurement periods in

calendar year 2019." *Id.* CMS finalized its proposals—which relied heavily on § 1395w-

23(b)(2)—to modify future Star Ratings measures either via rulemaking (for new

measures and substantive changes to existing measures) or via the Advance Notice and

Rate Announcement process (for non-substantive changes). 83 Fed. Reg. at 16,533,

16,537; *see also* 42 C.F.R. § 422.164.

The text and history of the relevant regulatory provisions make it plain that the

Star Ratings measures do not implement the minimum call standard requirements.

Humana's erroneous claim that they do pervades its brief, and in particular underscores

its objections under the Medicare statute and APA.

---

[12] Humana says that "CMS has never announced or sought comment on the no-callbacks rule." Pls. Mot. 25. But in its 2018 rulemaking, CMS responded to comments about the "Call Center—Foreign Language Interpreter and TTY Availability" measure. *See* 83 Fed. Reg. at 16,551. And CMS explained that the "Star Ratings measure specifications supporting document, *Medicare Part C & D Star Ratings Technical Notes*, provides detailed specifications for each measure. . . . The Technical Notes document is updated annually." *Id.* at 16,538. Finally, CMS described how the rules it "finalized at paragraphs (c), (d), and (e) of §§ 422.164 and 423.184" made it unnecessary to "codify a list of measures and specifications in regulation text." The no-callback policy is plain from the guidance. *See, e.g.*, AR78 (call "will be scored as unsuccessful if we are not able to connect to a live CSR at the plan during that scheduled call"); AR81 ("A call is classified as unsuccessful for any of the following reasons: . . . [s]urvey could not continue; Call Center disconnected call (including hanging up)."). Humana or any other MAO could have objected to the policy during any annual update. CMS has not deprived Humana of either notice or the opportunity to provide comment on the Star Ratings measures.

### 3.    The Star Ratings measure specifications do not establish eligibility criteria.

The Medicare statute's notice-and-comment provision does not apply to the Star Ratings measure specifications. As described more fully above, the no-callbacks policy does not "define[] the duty of an MAO to comply with 42 C.F.R. §§ 422.111(h)(1)(iii) and 423.128(d)(1)(iii)," Pls. Mot. 19, because the Star Ratings measures do not enforce the call center minimum standards regulation. The Agency's promulgation of those minimum standards via notice and comment says nothing about the Agency's understanding that Star Ratings measures are themselves "'substantive legal standards' covered by § 1395hh(a)." *Id.* The Agency described its understanding about the basis and scope of the Star Rating system in a regulation captioned "Basis and scope of the Medicare Advantage Quality Rating System." 42 C.F.R. § 422.160. That provision nowhere cites § 1395hh, because § 1395hh does not apply.

The main reason that § 1395hh does not apply to Star Ratings measures is that Star Ratings do not govern "the scope of benefits, the payment for services, or the eligibility of individuals entities, or organizations to furnish or receive services or benefits under" Medicare. Quality Bonus Payments are not benefits, nor are they payment for services, nor are they eligibility criteria. Humana's arguments to the contrary are unavailing. It says that "the no-callbacks rule affects MAOs' quality bonus payments and rebates." Pls. Mot. 20. But those are not "payments for services," as evidenced by the fact that MAOs who do not receive quality bonus payments have the same obligation to provide insurance (i.e., pay for members' covered services) as those that do receive quality bonus

payments. A quality bonus payment is exactly what it sounds like—an extra payment for achieving a certain quality level, as measured by the Star Ratings.

Nor does the fact that Star Ratings can "influence[]," Pls. Mot. 20, MAOs' ability to enroll beneficiaries outside of open enrollment and affect plans' ability to participate render every Star Ratings measure an eligibility criterion under § 1395hh. The statute refers to a "substantive legal standard *governing* . . . eligibility." 42 U.S.C. § 1395hh (emphasis added). Mere influence is not enough. With respect to high-performing plans, the ability to enroll beneficiaries outside of open enrollment is not an eligibility criterion at all. With respect to low-performing plans, the eligibility criterion becomes relevant only upon two consecutive years of 2.5-star or below performance, and it provides only that CMS "*may* deny an application." 42 C.F.R. § 422.502(b)(1)(*i*)(D) (emphasis added). Moreover, as Plaintiffs acknowledge, the substantive legal standard governing eligibility (i.e., the regulation stating that CMS may deny an application based on poor Star Ratings performances) is found in regulation—namely, the one they cite. Pls. Mot. 20. Section 1395hh does not require that any criterion potentially affecting or (to use Humana's term) influencing eligibility, no matter how attenuated, also be the product of notice and comment rulemaking. Because the Star Ratings measure specifications do not govern payment for services or eligibility to participate in Medicare, they are not covered by § 1395hh.

This Court therefore does not need to reach the issue of whether MAOs "furnish . . . services or benefits." 42 U.S.C. § 1395hh(a)(2). At most, Humana has shown that the Medicare statute is ambiguous on this point. That MAOs "provide . . . through

providers . . . services to beneficiaries" does not imply that they "furnish services." Pls. Mot. 21. The providers do the furnishing, the MAOs do the paying.[13] Nor do two references to "insurance benefits" in the Medicare statute automatically mean that insurance is itself a service, particularly given that both clauses discuss "individuals entitled to insurance benefits." 42 U.S.C. § 1395x(f)(3); (k); *see* Pls. Mot. 22. Again, the fact that an individual is entitled to "insurance benefits" does not imply that MAOs "furnish benefits." The portion of the Medicare statute establishing Medicare Part C defines "benefits under the original medicare fee-for-service program option" to mean "items and services . . . for which benefits are available under parts A and B." 42 U.S.C. § 1395w-22(a)(B)(i). Had Congress wanted to require that the minutiae of the Star Ratings measure specifications be subject to notice-and-comment under § 1395hh, it could have done so quite clearly. That it did not do so is strong evidence that § 1395hh does not require CMS to promulgate Star Ratings measure specifications via notice-and-comment rulemaking.

**4.    5 U.S.C. § 553(b) does not apply to Star Ratings measures.**

Humana's argument that the Agency was required to promulgate its no-callback policy via the APA's notice-and-comment procedures relies entirely on the flawed premise, discussed above, that the Star Ratings measures implement the call center minimum standards regulation at 42 C.F.R. § 422.111(h)(1)(iii). *See* Pls. Mot. 23 ("the

---

[13] Under "traditional" Medicare, where the government pays providers directly for items and services furnished to beneficiaries, the government's payment role does not transform it into an entity that furnishes services.

no-callbacks rule amends 42 C.F.R. §§ 422.111(h)(1)(iii) and 423.128(d)(1)(iii)" and "the no-callbacks rule controls MAOs' obligations with respect to compliance with" the same regulations). The basis of Plaintiffs' APA argument is that the no-callbacks policy modifies an existing legislative rule. But this is not the case: the Star Ratings measure plan quality on a curve, not compliance with minimum standards.

The guidance materials describing the Star Ratings measure specifications are fully consistent with the 2018 legislative rule in which the Agency described how it would implement the Star Ratings going forward. *See* 42 C.F.R. § 422.164. Humana does not challenge § 422.164 or any other aspect of the 2018 rulemaking. CMS used notice-and-comment to establish a legislative rule governing how it would implement the Star Ratings measure specifications, and it has followed that rule. It is unclear, on these facts, how it could be in violation of the APA.

Moreover, while Humana says that "the no-callbacks rule is a substantive rule" under a recent Fifth Circuit case describing the framework for determining whether a rule is legislative, it never applies that framework. Pls. Mot. 23. *Mock v. Garland* lays out a five-factor test: (1) whether the agency intended to speak with the force of law; (2) whether the agency published its rule in the Code of Federal Regulations; (3) whether the agency explicitly invoked its general legislative authority; (4) whether the agency claimed *Chevron* deference;[14] and (5) whether the rule will produce significant effects on

---

[14] It is unclear how this factor should be applied in the wake of *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024). But CMS has not historically claimed *Chevron* deference with respect to the administration of the Star Ratings, and in any event Humana's failure to apply the *Mock* factors constitutes waiver.

private interests. *Mock v. Garland*, 75 F.4th 563, 580 (5th Cir. 2023). Two of the factors, *Chevron* deference and publication in the Federal Register, are clearly absent. The Agency also did not invoke its general legislative authority, either in the Technical Notes themselves or in the regulation describing how it would promulgate Star Ratings measures. There is no evidence that the Agency intended to speak with the force of law. Star Ratings are a way to provide consumers information about plan quality, and the Quality Bonus Payments associated with Star Ratings are extra funds that incent plans to provide high quality services across a variety of dimensions, including call center interpreter availability. Failure to adhere to Star Ratings measure specification criteria results in lower scores, but there are no legal prohibitions or threats of punishment (either civil or criminal) in the Star Ratings. *Cf. Mock*, 75 F.4th at 580-81 (quoting rule at issue and describing potential criminal and civil liability).

This leaves the effect on private interests. Humana has alleged significant financial consequences from its unsuccessful calls, although (as discussed above) it has failed to demonstrate a connection between its unsuccessful calls and the no-callback policy. But under the rule at issue in *Mock*, if it were deemed interpretive, "millions of Americans were committing a felony the entire time they owned a braced pistol." *Id.* at 582. There is no analogue here. Potential criminal consequences for millions of people is a vastly more significant private interest than a single company being ineligible for bonus payments. Even if it reaches the issue—and there is no need to—this Court should conclude that the no-callback policy is not a legislative rule.

**5.      Humana misapprehends the role of 42 C.F.R. § 422.164, and any procedural error was harmless.**

Humana offers a rebuttal to arguments made in CMS's earlier briefing. *See* Pls. Mot. 24-27. Namely, Humana contends that the informal notice -and-comment process of 42 U.S.C. § 1395w-23(b) does not apply to Star Ratings measurements. *Id.* Humana's argument misses the mark. CMS promulgated a regulation, 42 C.F.R. § 422.164, that describes how CMS would modify the Star Ratings measure specifications annually going forward. Humana appears to argue that the regulation at § 422.164 is inconsistent with the statutory provision at § 1395w-23(b), but Humana has not actually claimed that the regulation is arbitrary and capricious, inconsistent with the statute, or otherwise legally infirm.

What § 422.164 shows is that CMS has, since 2018, described its process for updating the Star Ratings measures. And that process includes an opportunity for MAOs like Humana to comment on the details of those measures, including (for example) urging the Agency to modify its policy requiring that a call center satisfy the interpreter availability requirement in a single call. Humana is no longer alleging any unfair surprise arising from the single-call policy; indeed, it claims to have a policy in place of not calling back when a call it believes has come from a CMS test caller is disconnected. Pls. App. 14 (Sanders Decl. ¶ 5). Rather, Humana's position in this Court is that a policy of which it was fully aware—and with which it could have raised concerns at any time during an annual notice-and-comment process—is nonetheless procedurally defective.

But Humana cannot ignore its opportunities to participate in a process with CMS, then credibly claim in court that the results of that process are procedurally unfair.

In an APA case, "due account shall be taken of the rule of prejudicial error." 5 U.S.C. § 706. Even if there was some procedural error in the adoption of the no-callback policy, Humana has not been prejudiced by it for two reasons. First, as already discussed, the no-callback policy played no role in CMS's disposition of the connected calls because Humana did not attempt a callback. Second, Humana has now left no doubt that it was aware of the no-callback policy, and there is no reason to believe that the Agency would have adopted a different policy in response to (entirely hypothetical) comments opposing it.

### 6.    The policy against callbacks is not substantively arbitrary.

In its final salvo against the disconnected calls, Humana claims that the policy against callbacks is "substantively arbitrary." Pls. Mot. 26-29. Much of this argument is based on the flawed premise underlying Humana's other arguments: that the Star Ratings are an enforcement mechanism for the call center minimum standards rule. *See* Pls. Mot. 26-27. Again, the Star Ratings grade plan performance on a curve and the minimum standards set a performance floor. Star Ratings do not enforce or implement minimum performance standards.

The no-callback policy is rationally connected to the goals of the Star Ratings. The Call Center Measures are part of the "Customer Service" domains of the Star Ratings. *See* AR195 (Health Plan Customer Service) & AR200 (Drug Plan Customer Service). Customer Service measures are meant to measure the quality of a Plan's ability to

provide help to beneficiaries who need it. Anyone who has called a customer service phone line, been abruptly disconnected, and later received a call (perhaps at an inconvenient time) would likely agree that a call center that does not drop calls and provides answers on a single call provides better customer service. And, of course, for anyone who uses a private number, a callback system is useless. Far from being irrational, the Call Center Measures capture a plan's ability to provide a service that is important to Medicare beneficiaries.

Plaintiffs are also wrong about the Agency allegedly double-counting calls. Pls. Mot. 28. Humana acknowledges that the "Accuracy and Accessibility study applies to calls from prospective enrollees, whereas the Timeliness Study applies to calls from current enrollees." *Id.* Humana agrees, then, that no single disconnection is double-counted, but Humana still insists that is arbitrary for the Accuracy and Accessibility Study to count call disconnections against a plan. But a disconnection is one of any number of ways that a call center could fail to provide accurate and accessible information to prospective enrollees. Plaintiffs provide no basis for a conclusion under the arbitrary and capricious standard that certain shortcomings (here, Humana's shortcomings) should not count against a plan.

\* \* \*

In sum, for the two challenged test calls that disconnected, Humana's call center failed to perform a core function: connecting foreign-language callers with interpreters who could assist them in answering questions. Humana casts about for a way to blame CMS for Humana's own failures. None has merit. Humana knew the standards that

would be applied to it, and it indisputably failed to meet those standards. Humana itself agrees, at least in theory: "If a call center drops a call and then fails to call back or takes too long calling back, the call of course should be scored unsuccessful." Pls. Mot. 28. CMS's decision to apply this standard was neither arbitrary nor capricious.

**B.    CMS's Decision to Classify Silent Call as "Unsuccessful" was Neither Arbitrary nor Capricious.**

Humana separately challenges a call in which a Tagalog caller dialed the correct number, waited through the entire Interactive Voice Response (IVR) menu, and remained on the line until Humana disconnected the call after about five and a half minutes of complete silence. As with the disconnected calls, Humana marshals no argument that a Medicare beneficiary who experienced this treatment from a call center would describe it as a "successful" experience.

Humana's sparse factual claims about the call lack record support. It says the caller's "notes suggest that he *mistakenly* believed he was on a silent hold and did not speak." Pls. Mot. 29 (emphasis added); *see also id.* at 30 (again describing test caller's belief as "mistaken"). But the only relevant evidence in the record is the caller's notes; Humana could have shown (but did not show) the Agency that the caller was mistaken by introducing evidence that the caller was not on a silent hold. It did not do so, yet it persists in telling this Court that the caller was mistaken. There is no evidence in the record to support Humana's version of events.

The company's core contention here is that a Medicare beneficiary who has called its customer-support phone number should, having sat through an IVR menu and several

minutes of silence, say something. Humana states, "A call center's obligation to provide an interpreter is triggered only if a caller 'reaches' a" customer service representative. Pls. Mot. 29. Under Humana's reasoning, if a call center performs so incompetently that no representative is ever made available to a caller, that call center has no obligation to provide an interpreter and cannot be faulted for poor customer service. This is an untenable claim. In Humana's view, a call center that answers a call but for whatever reason cannot provide an interpreter within the required window should justly receive an unsuccessful rating, but one that cannot even put a human being on the line before abruptly terminating the connection should be treated as if the attempted call never occurred.

Shifting gears slightly, Humana says that because the call never "connected" with a representative within the meaning of the guidelines, the MAO should be absolved of any responsibility for its failure to provide an interpreter. Humana say this flows from CMS guidance. But CMS guidance covers this situation: "A call is classified as unsuccessful for any of the following reasons . . . [s]urvey could not continue, Call Center disconnected call (including hanging up)." AR81. It is irrelevant to the ultimate disposition of the call whether the caller spoke to a customer service representative, because it is undisputed that the test caller made contact with Humana's call center, which then hung up on the caller. Again, consider the ramifications of Humana's logic: a call center that makes it impossible to reach a customer service representative could never fail a test call.

Humana finally asks this Court to reach the same result that the Eastern District of Texas reached in a case presenting starkly different facts. In *UnitedHealthcare Benefits of Texas, Inc. v. Centers for Medicare & Medicaid Services*, No. 6:24-cv-357-JDK, 2024 WL 4870771 (E.D. Tex. Nov. 22, 2024), the plaintiff MAO (unlike Humana) provided a recording of the call, which showed that the test caller used the IVR system to select the option for French and heard a voice begin to say something before being cut off abruptly. *UnitedHealthcare*, 2024 WL 4870771, at *2. The test caller said "hello?" but heard nothing and said nothing else until the customer service representative "terminate[d] the call after approximately eight minutes." *Id.*

Two facts that were key to the *UnitedHealthcare* decision are absent here. First, the court in *UnitedHealthcare*, relying on a call recording provided by the MAO, found that the call "connected" to a *customer service representative*. *Id.* at *4. Here, by contrast, there is no recording (due to Humana's inability or unwillingness to provide one) and, as Humana itself argues, the call never connected. It is puzzling that Humana insists that *UnitedHealthcare* presents "analytically identical facts," Pls. Mot. 31, when Humana itself acknowledges that, unlike the call at issue in *UnitedHealthcare*, the test caller here never connected to a CSR. Second, there is no dispute here that Humana terminated the call after fewer than eight minutes, again in contrast to the call at issue in *UnitedHealthcare*. *See* 2024 WL 4870771, at *4 ("The record evidence demonstrates that the call 'connected,' the call lasted more than eight minutes, and the test caller never asked the introductory question contemplated at phase three of the call. Thus, the call

should not have been marked as 'unsuccessful' according to the guidelines."); *id.* at *4 n.1.

The record is clear that the failure to connect was Humana's fault, and that Humana terminated the call in fewer than eight minutes. The test caller dialed the correct number and reached Humana's Interactive Voice Response. AR9.[15] CMS's call log indicates that the test caller spent 71 seconds on the Interactive Voice Response system and did not make a selection. AR9.[16] The caller's action is consistent with Tagalog not being an option in the Interactive Voice Response menu. CMS guidance says that plans should "[e]nsure [Interactive Voice Response] systems default to a live CSR/operator if the caller does not push any buttons or make a verbal selection from an options menu." AR43. Instead of having a live CSR answer the call, the CMS test caller heard silence, leading to a reasonable (and, more importantly, undisputed based on record evidence) belief that he or she was on a silent hold for four minutes and seventeen seconds, at which point the call was terminated by the call center. AR9.[17]

The Technical Notes explain that calls are classified as "unsuccessful" if the call center hangs up on a caller: "A call is classified as unsuccessful for any of the following reasons . . . [s]urvey could not continue, Call Center disconnected call (including hanging

---

[15] The data for this call is contained in an Excel spreadsheet with the file name "03.A Attachment SII_RawCallLog_2024_Full_C0701002." The corresponding column is BY.

[16] *Id.* The corresponding columns are AX and BZ.

[17] *Id.* The corresponding columns are H, I, and AY.

up).” AR81. And, as discussed elsewhere, changes to the Technical Notes from prior years would have been part of the Advance Notice and Rate Announcement process or notice-and-comment rulemaking. 83 Fed. Reg. at 16,533, 16,537; *see also* 42 C.F.R. § 422.164.

Humana could have provided data to CMS during the Quality Bonus Appeals process to support its key claim that the call in fact connected and the test caller's belief about a silent hold was “mistaken.” It chose not to do so. The evidence in the record therefore is unambiguous in supporting CMS's version of events: a caller dialed the correct number, waited through an Interactive Voice Response message that did not include an option for the caller's language, then heard nothing but silence until an abrupt disconnection. Such a call is “unsuccessful” under any definition of the term, and CMS was correct to score it that way. There is no basis under the substantial evidence standard for this Court to disturb CMS's determination.

## V.    Conclusion

For the reasons described above, Defendants respectfully request that this Court deny Plaintiffs' summary-judgment motion and grant summary judgment to Defendants on all counts, pursuant to Federal Rule of Civil Procedure 56.

Respectfully submitted,

NANCY E. LARSON
ACTING UNITED STATES ATTORNEY

*/s/ Andrea Hyatt*
Andrea Hyatt
Assistant United States Attorney
Texas Bar No. 24007419
Burnett Plaza, Suite 1700
801 Cherry Street, Unit #4
Fort Worth, Texas 76102-6882
Telephone: 817.252.5230
Fax: 817.252.5458
Andrea.Hyatt@usdoj.gov

*Attorneys for Defendants*

## Certificate of Service

On August 19, 2025, I electronically submitted the foregoing document with the

clerk of court for the U.S. District Court, Northern District of Texas, using the electronic

case filing system of the court. I hereby certify that I have served all parties electronically

or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/ Andrea Hyatt*
Andrea Hyatt
Assistant United States Attorney